651 So.2d 890 (1995)
STATE of Louisiana, Appellee,
v.
Daronghel L. SMITH, Michael W. Gibson and Ashley D. Baker a/k/a Poo Jack, Appellants.
Nos. 26661-KA to 26663-KA.
Court of Appeal of Louisiana, Second Circuit.
March 1, 1995.
*893 John Focke, II, Michael Courteau, Peter Edwards, Monroe, for appellants.
Charles L. Cook, Monroe, for appellee.
Before LINDSAY, BROWN and STEWART, JJ.
STEWART, Judge.
A jury convicted the three defendants of second degree murder and attempted second degree murder resulting from a drive-by *894 shooting. Each was sentenced to the mandatory sentence of life imprisonment at hard labor without parole, probation, or suspension of sentence for the second degree murder conviction. Defendants Smith and Baker were also each sentenced to 360 months at hard labor for the attempted second degree murder conviction, with the sentence to run consecutively to the second degree murder sentence. Defendant Gibson was sentenced to 126 months at hard labor for the attempted second degree murder conviction, with the sentence to run consecutively to the second degree murder conviction. The defendants appeal their convictions and sentences. We affirm.

FACTS
According to testimony adduced at trial, on September 29, 1992, the Monroe Police Department investigated a drive-by shooting that occurred outside a residence on South 4th Street. Several people were outside the house when three cars with their lights off turned onto South 4th Street and drove by the house. Shots were fired, and witnesses heard occupants from the cars shout "This is what B.T. is like" or "Booker T." The victims of the shooting were Shecky Brooks, who died from a single gunshot wound to the left back side of his head, and Karen Butler, who was shot in the chest, but managed to survive.
Subsequent investigation revealed that defendant Baker was in one of the cars and defendants Gibson and Smith were in another car. All three defendants were indicted by a grand jury for first degree murder and attempted first degree murder. The state later amended the indictments to second degree murder and attempted second degree murder and consolidated the indictment for trial. The trial began on March 8, 1993, and concluded on March 10. The jury convicted all three defendants as charged. Defendants appeal their convictions and sentences to this court.[1] The testimony presented at trial is summarized as follows:

STATE'S WITNESSES
Detective Larry Buford of the Monroe Police Department testified that when he arrived at the house on South 4th Street, he found several bullet casings on the ground and several places where bullets had hit the house. He also identified the victims as Shecky Brooks and Karen Butler.
Yakeen Hodge was at the house at the time of the shooting. He testified that he was sitting in his car outside the front of the house when the shooting began. As the cars drove by, someone from one of the cars shouted, "This is what B.T. is like." Hodge was unable to identify who made the statement or determine from which car it came. After the shooting began, Hodge testified that he dove under the front end of his car. On cross-examination Hodge stated that several shots came from each car and that the shots continued from the time in which he was in the car until after he jumped under the front of the car.
Karen Butler, the victim who survived, testified that she was standing under the carport when the three cars drove by the house. An occupant of one of the cars shouted "Booker T.," and then shots were fired. She also was unable to identify who made the statement or any of the occupants of the cars. Butler testified that she had seen the cars turn onto the street and then the lights were extinguished. On cross-examination, Butler admitted it was possible that one of the cars had its lights on and that she was unable to determine if shots came from each of the cars. The state later recalled Butler, and she testified that none of the people at the house had guns prior to the shooting. Butler also stated that no one at the house fired any shots.
Sgt. Jim Gregory, an investigator with the Monroe Police Department, worked the crime scene. He testified that thirteen 9 millimeter casings and fourteen .22 caliber casings were found either on the street itself or on the shoulder of the street by a ditch. None of the shells were found beyond the ditch closer to the house. Sgt. Gregory also testified that bullets had hit the rear of the *895 car parked in the driveway of the house (apparently witness Hodge's car) and that bullet fragments were found on the ground in front of the car, on the floors of the carport and laundry room, both of which faced the street, and in the eave of the carport. Pictures depicting the bullet holes and fragments as well as a diagram of the scene indicating the location of the casings and bullet holes were admitted into evidence. Sgt. Gregory also stated that because he used a 9 millimeter automatic weapon in his employment with the police department, he was familiar with its operation. He testified that after the last shot has been fired from such a weapon, the slide normally locks back to the rear position.
Dr. George McCormick, the Caddo Parish Coroner, performed the autopsy on Shecky Brooks. He testified that Brooks died from a laceration to the brain as the result of a single shotgun wound to the head. Dr. McCormick further stated that the bullet fragments recovered from the victim were too small for any type of analysis.
In addition to the above summarized testimony about the nature of the crime scene and victims, the state also presented testimony regarding each of defendant's involvement in the shooting:

Daronghel Smith and Michael Gibson
Linda Holmes testified that she knew all three defendants and had seen defendant Smith (nicknamed "Lecon") the night of the shooting at a party in a field. She also stated that defendant Gibson drove one of the cars down South 4th Street at the time of the shooting. Holmes testified that just prior to driving down South 4th, Gibson stopped at a house where his girlfriend got out of the car.
Rayshell Sims testified that she was also at the party in the field. A group of men had gathered, and Sims overheard someone say, "Let's go down and do a drive by on South 4th." However, Sims also testified that everyone was laughing and thought the statement was a joke. On cross-examination she positively stated that Daronghel Smith was present when this statement was made. A large group of people in about eight cars then left the field and drove down South 4th Street, although no shooting occurred at this point. The group later returned to the field. Sims testified on cross-examination that Gibson drove one of the cars down South 4th Street first before the shooting took place. Later, three cars then again left the field, and Sims testified that defendant Gibson was in one of the cars. She stated that they stopped at Gibson's mother's house to drop off his girlfriend and then went to South 4th Street where the shooting took place.
Khisha Harris also testified that she saw defendants Smith and Gibson at the party in the field on the night of the shooting. She stated that she left the field and later returned in Gibson's car. Gibson was driving, and Smith was also a passenger. Harris again left the field along with a large group she was unable to identify, and they drove down South 4th Street, although no shooting occurred. The group then went to New Town Apartments where all three defendants were present. It is unclear from Harris' testimony, but it appears these apartments were located in close proximity to the field.
Harris testified that she left the field again in Gibson's car, and he was driving. Smith was sitting in the front passenger seat of the car. The group went to Gibson's house where a female passenger got out of the car. They then traveled to the corner of South 4th Street, and at some point were joined by other cars. While at the corner of South 4th, Harris stated that someone from another car instructed Gibson to turn off his lights, and he complied. They then drove down South 4th, where the shooting began. Harris testified that she saw three or four people outside of the house on South 4th and that just before the shooting began, she saw Smith with a gun in his hand. However, Harris did not see anyone actually shoot because she put her head down when the shots began. After the shooting, they drove away at a faster rate of speed than they had been travelling. Harris admitted that she had been drinking that night, but stated this factor had no effect on her ability to recall what happened.
On cross-examination, Harris stated that she had no idea the shooting was to occur *896 and that the shooting was not discussed in the car. She did not know whether or not defendant Gibson was surprised by the shooting. However, when asked if after the shooting, whether Gibson asked a statement such as "what's going on" after the shooting and then told the other passengers to get out of the car, Harris replied that he did not. She also testified that earlier that night someone gave Gibson money to drive them in his car, but that no one instructed him as to where to go. Harris again stated that she saw defendant Smith with a gun just before they arrived at South 4th Street and also saw him with a gun in the field before the shooting.
David Davis was also in the field the night of the shooting and testified that both Smith and Gibson were there. He left the field with the group in Gibson's car, and they later returned before leaving again for South 4th Street. Davis testified that Gibson was driving, Smith was in the front passenger seat, and Khisha Harris, Wesley Daniels, Johnny (Bradford), and Davis were in the back seat. Davis had fallen asleep, but was awakened by the shooting. He testified that he saw Wesley Daniels (a/k/a Flip) shooting a gun and saw Smith with a gun in his hand laying on his lap. Davis heard more than five shots being fired. He also stated that the Gibson car was in front and that there were other cars behind it, but was unsure as to how many. Davis identified the gun in Smith's hand as a small automatic. He testified that the "chamber" (incorrect terminology) was pulled back. Finally, he was able to see the people under the carport outside the house where the shots were fired.
On cross-examination, Davis testified that he, Khisha, and Gibson were all surprised by the shooting. However, he later stated that he could not tell if Gibson looked surprised or not. Davis also admitted that he fell asleep partly because he had been drinking. Davis further testified that Gibson was not with him when a group went down South 4th Street about 45 minutes before the shooting. He stated that he remembered Wesley Daniels ("Flip") telling Gibson to go down South 4th Street on the pass when the shooting occurred.

Ashley Baker (a/k/a "Poo Jack")
Linda Holmes testified that she knew defendant Baker and had seen him at the party in the field the night of the shooting. Later that evening Holmes left the field in a car along with Baker, Rayshell Sims, Nicotine (real name unknown), and the driver (unknown). Holmes stated she thought there were two other cars that left with them. The group then traveled to South 4th Street where someone shouted, "Turn the lights out." Baker was sitting in the front passenger seat, and Holmes saw Baker and a passenger in the back seat with guns. At that point, she and Sims lowered their heads, and then heard Baker shout "This is from B.T." and fire his gun out of the car. The passenger in the back seat also fired his gun.
On cross-examination, Holmes again stated that she saw Baker with a gun in his hand just prior to the group turning onto South 4th Street. However, she recanted her prior testimony that she had seen Baker fire the gun. Holmes stated that she could only testify that she heard shots fired from the car.
On re-direct examination, the state reviewed a prior statement that Holmes had made to the police. In the statement, she said that Baker fired four shots. Holmes stated that the prior statement was incorrect and that she said three to four shots were fired from the car. On re-cross examination, she testified that she had reviewed the prior statement, but did not pay any attention to what she was now claiming to be an incorrect statement.
Rayshell Sims, who was also in the car with Baker, testified that when they arrived on South 4th Street the second time, someone said, "Turn your lights out." They then drove slowly down the street and stopped in front of the house. Sims stated that Baker shouted, "This B.T. fool. We'll play." Baker and a passenger in the back seat then began shooting. She testified that she saw Baker with a gun in his hand, and that he fired it. After the shooting they took Baker home, and Sims overheard him say, "Open this door because I just killed that bitch on South 4th."
On cross-examination, Sims testified that both defendants Smith and Baker were present *897 in the field when the statement "Let's do a drive-by" was made and that Baker was in among the group of people from which the statement was made. She also stated that she saw Baker fire one shot before she ducked. Sims then heard from eight to ten shots being fired. She estimated that the car stopped in front of the house for about a minute-and-one-half.

DEFENSE WITNESSES
After the state rested, defendant Gibson called Johnny Bradford to testify. Bradford stated that the day of the trial was the first time he had come forward with any information about the drive-by shooting because he was on probation. Bradford was in the car with Gibson and Smith. He testified that he saw Wesley Daniels (nicknamed "Flip") shoot a 9 millimeter gun out of the car window in the direction of the victim that got shot. He also stated that Daniels told Gibson where to drive and that Gibson appeared to not know where he was going.
On cross-examination, Bradford testified that he did not see defendant Smith with a gun in the car or fire a gun. Bradford also stated that the headlights were off in the Gibson car at the time of the shooting, but could not say who instructed Gibson to do so. However, Bradford was able to remember Daniels instructing Gibson to stop at the stop sign just prior to the shooting. Bradford also testified that he did not know if there was shooting from any of the other cars.

ASSIGNMENTS OF ERRORS

Daronghel L. Smith:
1. The verdict is contrary to the law and evidence.
2. Trial court's failure to sustain defendant's objection to hearsay concerning remarks made by an unknown person in the "field" concerning a "drive-by".
3. Trial court's failure to sustain defendant's objection to two jury instructions.
4. Trial court's failure to sustain the defendant's request for a mistrial in regards to the dismissal of a juror and to inquire of the other jurors of threats they may have heard concerning the dismissed juror.
5. Imposing the 360 month sentence for attempted second degree murder conviction consecutive with the life term imposed for the second degree murder conviction.

Michael Gibson:
1. The verdict is contrary to the law and the evidence.
2. Testimony proved a complete lack of specific intent on defendant's part.
3. State's failure to remove every reasonable hypothesis of innocence when defendant was convicted only on circumstantial evidence.
4. State's failure to prove the requisite knowledge on defendant's part.
5. Trial court's failure to sustain the defendant's request for a mistrial in regards to the dismissal of a juror and to inquire of the other jurors of threats they may have heard concerning the dismissed juror.

Ashley Baker:
1. Insufficient evidence to support the verdict.
2. Trial court's failure to sustain the defendant's request for a mistrial in regards to the dismissal of a juror and to inquire of the other jurors of threats they may have heard concerning the dismissed juror.
3. Excessive/consecutive sentences.
4. Error patent.

DISCUSSION
The verdict is contrary to the law and evidence/Insufficient evidence to support the verdict. (All defendants)
Testimony proved a complete lack of specific intent on defendant's part. (Gibson only)
State's failure to remove every reasonable hypothesis of innocence when defendant was convicted only on circumstantial evidence (Gibson only)
State's failure to prove the requisite knowledge on defendant's part. (Gibson only)
*898 In these assignments, defendants argue that the verdict was contrary to the law and evidence (insufficient evidence to support the jury's verdict). Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of the evidence claim is, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied, 605 So.2d 1089 (La.1992). The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817 (La.1987); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
Each defendant was convicted of second degree murder and attempted second degree murder. The relevant part[2] of LSA-R.S. 14:30.1 states:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm;
LSA-R.S. 14:27 defines attempt and states in part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
When viewed in the light most favorably supporting the jury verdicts, the evidence hereafter summarized is legally sufficient to convict each defendant of second degree murder and attempted second degree murder.

Daronghel Smith
Defendant Smith argues that there was no direct or circumstantial evidence that he was involved in the commission of these two crimes. He claims that although he was present in the first vehicle, this fact does not prove he directly committed the act, aided and abetted in the commission of the act, or procured another to do so. Smith cites State v. Otis, 586 So.2d 595 (La.App. 2d Cir.), writ granted on other grounds, 589 So.2d 487 (La.1991), where this court held:
Where the conviction is based upon circumstantial evidence, LSA-R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. However, LSA-R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula. It is merely an evidentiary guide for the jury when considering circumstantial evidence.
Id. at 604 (citations omitted).
Smith argues that reasonable hypotheses of innocence existed. He argues that if he knew a "drive-by" was to occur, no evidence was introduced that he was aware such a term meant shooting at people and not scaring people by shooting in the air. Finally, Smith also claims that the evidence did not prove that he had the specific intent to kill or to inflict great bodily harm. These arguments are without merit.
Linda Holmes, Rayshell Sims, and Khisha Harris all testified to seeing Smith at the party in the field on the night of the shooting. Further, Sims testified that a group of men had gathered and someone said, "Let's go down and do a drive by on South 4th." *899 She stated that Smith was present when the statement was made. Khisha Harris was a passenger in the back seat of the car with Smith when the shooting occurred. She testified that the group traveled to the corner of South 4th Street. Someone from another car told defendant Michael Gibson to turn off the lights. The cars then drove by, and Harris heard shots being fired. She stated that just prior to the shooting, she had seen Smith with a gun in his hand. Harris also testified that she had seen Smith earlier with a gun in the field. David Davis, another passenger in the back seat, testified that he was awakened by the shooting and saw Smith with a gun in his hand laying on his lap. He identified the gun as a small automatic with what he called the "chamber" pulled back. He later stated that such a term was probably incorrect, but that the gun had "something" pulled back. Sgt. Gregory had previously testified that after a 9 millimeter automatic weapon had been fired, the slide normally locked back to the rear position.
The above summarized testimony was sufficient for the jury to convict Smith and to erase all reasonable hypotheses of innocence. First, the state showed that Smith had the requisite intent to commit the crimes. LSA-R.S. 14:10(1) states:
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
Smith was in the field when the statement regarding a drive-by on South 4th Street was made, and he had a gun at the field and inside the car. He had the gun in his hand when the group of cars stopped at the corner of the street and the drivers extinguished the lights. A juror could reasonably conclude that Smith was aware that a drive-by shooting was going to happen and that he was going to participate, thereby possessing the requisite criminal intent.
It is true that no one testified that they saw Smith fire a gun or that the state proved that bullets from Smith's gun hit the victims. However, as the state argues, the theory of principals under LSA-R.S. 14:24 is applicable. This statute states:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Smith had a gun in his hand laying in his lap immediately after the shooting. There was testimony as to "something" having been pulled back on the gun, and the slide on such a weapon does lock back to the rear position after the last shot is fired. A jury could conclude from this testimony that Smith had fired the gun. He was concerned in the commission of the crime regardless of whether his bullet hit the victims.
Finally, Smith's argument that a reasonable hypothesis of innocence existed is also without merit. He claims it was possible that he did not know the term "drive-by" meant shooting at people as opposed to scaring people by shooting in the air. However, the above summarized testimony that was sufficient to show his criminal intent also defeats this premise. His claim of not knowing the meaning of the term "drive-by" is not reasonable in light of the circumstances.

Michael Gibson
In his first four assignments of error, Gibson argues that the jury's verdict was contrary to the law and evidence and that he neither had the specific intent nor requisite knowledge required for a conviction of second degree murder and attempted second degree murder. He further claims that the state failed to remove every reasonable hypothesis of innocence as required for a conviction based upon circumstantial evidence. Gibson has also filed a supplemental brief in addition to the brief his counsel prepared, and he raises essentially the same arguments. All of Gibson's arguments are without merit.
Witnesses Holmes, Sims, Harris, and Davis all testified that Gibson drove one of the cars down South 4th Street when the shooting occurred. Sims also testified that Gibson drove one of the cars during the first pass down South 4th Street before the shooting *900 occurred. Further, Harris and Davis both stated that Gibson was at the party in the field before the shooting and both were in the car that Gibson was driving during the shooting. Harris testified that a group eventually left the field in Gibson's car with Gibson driving. They drove to his house where a woman got out of the car. This woman was identified by several witnesses as Gibson's girlfriend. Gibson then drove to the corner of South 4th Street where other cars got behind his car. Someone from another car instructed Gibson to turn his lights off, and after he had done so he slowly drove by the house. Just prior to the shooting, Harris, who was sitting in the middle of the back seat, saw defendant Smith with a gun.
Davis was also a passenger in the back seat of Gibson's car and testified that Gibson's car was in front of the others. Davis also stated that he was able to see from the back seat the gun in defendant Smith's hand laying in his lap. Davis gave contradictory testimony as to whether or not Gibson was surprised by the shooting. He also remembered Wesley Daniels ("Flip") telling Gibson to drive down South 4th Street.
When viewed in the light most favorable to the prosecution, this evidence was sufficient for the jury to convict Gibson. The state proved that Gibson had the specific intent to kill or inflict great bodily harm as well as the requisite knowledge. Finally, this evidence was also sufficient to eliminate any reasonable hypothesis of innocence. First, Gibson was seen at the party in the field along with the other defendants and drove a car down South 4th Street one time previously before driving back for the shooting. Second, upon arriving at the corner of South 4th Street, Gibson assumed the role of the lead vehicle. Third, when instructed by someone in another car to turn off his lights, he readily complied. Fourth, witness Harris was able to see from the back seat that defendant Smith had a gun. It was reasonable for the jury to conclude that if Harris could see the gun from the back seat, then Gibson could also see it from where he was sitting in the front seat next to Smith. Finally, according to Harris, Gibson made no statement after the shooting as if he was surprised by the incident.
Thus, as the state contends, the jury could conclude that Gibson aided and abetted in the commission of the crime by giving his co-perpetrators the opportunity to kill or inflict great bodily harm. He drove to the crime scene, even if it was under the instruction of someone else, where he had already been once that evening. He stopped at the corner and turned off his lights. Passengers in Gibson's car had guns and fired shots at people outside of the house. This assignment is without merit.

Ashley Baker a/k/a Poo Jack
The evidence was also sufficient to support convictions for Baker of second degree murder and attempted second degree murder. Holmes testified that Baker was at the party in the field the night of the shooting. Further, Sims testified that Baker was among the group of people in the field who heard someone say, "Let's do a driveby." Baker later rode in the second car to South 4th Street where an unknown person shouted, "Turn your lights out." Holmes and Sims also both testified that Baker had a gun in his hand just prior to the shooting and both heard him shout "This is from B.T." or "This B.T. fool. We'll play." Sims stated she saw Baker fire one shot before she lowered her head. She also testified that the car in which Baker was riding stopped in front of the house while eight to ten shots were fired. Finally, Sims testified that when Baker arrived home after the shooting, Baker stated, "Open this door because I just killed that bitch on South 4th."
From this testimony, the jury concluded that Baker had the specific intent to kill or inflict great bodily harm. Baker was at the party in the field and was part of the group in which the statement "Let's do a driveby" was made. Baker was in the second car at the time of the shooting. There was testimony that not only did he have a gun just before the shooting, but also one witness saw him fire at least one shot out of the car window. Also, the statements Baker made both during the incident and afterwards show he had the requisite intent. As to *901 defendant's argument that there was no testimony that he actually shot anyone, again the theory of principals applies. Just as in the other two defendants' cases, the evidence adduced at trial was sufficient for the jury to find that Baker was directly concerned in the commission of this crime.
Trial court's failure to sustain defendant's objection to hearsay concerning remarks made by an unknown person in the "field" concerning a "drive-by." (Smith only)
Defendant Smith argues that the trial court incorrectly allowed Sims to give the hearsay testimony, "I heard somebody said something about, `Let's go down and do a drive by on South 4th.'" The statement was made by someone at the party in the field, but Sims was unable to identify who actually said it. Further, there was no testimony as to whether or not any of the defendants heard it.
The state cited LSA-C.E. Art. 801 D(4), which provides that certain statements are not hearsay:
Things said or done. The statements are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events, and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
Smith argues (1) that the statement was not made under the immediate pressure or occurrence of the event and (2) that no evidence was introduced that the statement was made by a participant. The state contends that the statement was a link in the chain of events leading up to the shooting. In support the state cites State v. Walters, 25,587 (La.App. 2d Cir. 01/19/94), 630 So.2d 1371, where this court held:
[T]he res gestae doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before and after the commission of the crime but also includes testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances. Furthermore, the amount of time that elapses between the statement and the occurrence of the crime is not the sole consideration in determining whether a statement is part of the res gestae.
Id. at 1375 (citations omitted). In Walters, the statement in question, about defendant's intentions to kill, was made by the defendant's wife some four hours before he actually shot the victim. This court held that the statement was a spontaneous one made by defendant's wife in response to the events unfolding before her and a link in the continuous chain of events leading to the victim's death. Id. at 1374-75.
At the trial of the instant case, the state argued that the statement as to the drive-by was made while the crime was occurring. The state claimed that the participants had guns out in the field and after the statement left to make the first pass down South 4th Street. However, both of these contentions were not supported by the testimony. When Sims testified, there had been no testimony as to anyone having a gun at the field. As the defendant points out, this testimony did not come until later from witnesses Harris and Davis. Further, defendant Gibson was the only defendant identified at this point as having participated in the first drive down the street. Neither Holmes nor Sims clearly identified all of the participants of the first trip.
It is submitted, however, that despite these misstatements by the state, the statement was made under the immediate pressure or occurrence of the event. The state is correct in citing Walters, supra, and contending that the statement was made spontaneously as part of the continuing chain of events of the shooting. Sims testified that she returned to the field between 12:30 and 1:00. Holmes and Sims testified that defendants Smith and Baker were at the party in the field, and Sims testified on cross-examination that Smith and Baker were both at the field when the statement in question was made. Within a 35 to 40-minute time frame, the statement was made, a large *902 group of cars left the field, drove down South 4th Street with defendant Gibson driving one of the cars, and then returned to the field. A smaller group then again left the field. This time the group definitely included all three defendants as well as others who had been in the field at the time of the statement. They dropped defendant Gibson's girlfriend off, and then went to South 4th Street where the drive-by shooting occurred.
Defendant's other argument is that there was no evidence that the statement was made by a participant in the event, as the term is used in LSA-C.E. Art. 801 D(4). However, the language and facts of Walters, supra, also defeat this argument, because the doctrine extends to testimony of what witnesses heard. Sims was a witness who heard the statement some 35 to 40 minutes prior to the shooting and was also a witness to the shooting itself. This assignment is without merit.
Trial court's failure to sustain defendant's objection to two jury instructions. (Smith only)
In this assignment, defendant Smith contends that the trial court erred in failing to sustain his objection to two of the state's requested jury instructions. The first contested instruction was as follows:
Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and therefore, is one of the circumstances from which the jury may infer guilt.
(Smith R. p. 80).
First, Smith argues that because no evidence was offered that he attempted flight, concealment, or avoidance of apprehension, this instruction afforded too much weight to evidence not existing. Second, he contends that even if there was evidence of flight, the instruction invaded the province of the jury because it stated that flight indicates consciousness of guilt and not that the jury could infer guilt from flight. However, the objection to the instruction at trial was premised only upon Smith's first argumentno evidence of flight. No mention was made of the instruction invading the province of the jury. A new basis for an objection cannot be raised the first time on appeal. State v. Cressy, 440 So.2d 141 (La.1983); State v. O'Neal, 501 So.2d 920, 924 (La.App. 2d Cir.), writ denied, 505 So.2d 1139 (1987); LSA-C.Cr.P. Art. 841.
Smith's argument that no evidence was offered of flight, concealment, or avoidance of apprehension is without merit. The state presented testimony of two witnesses, Harris and Davis, who were in the car with Smith at the time of the shooting. Both testified that they saw him with a gun in his hand while inside the car, and both stated that their vehicle left the scene immediately following the shooting. Further, as the state points out, Detective Buford testified on re-direct that Smith was not initially a suspect until later investigation revealed his involvement. Thus, there was some testimony that Smith fled from the scene of the crime and did not voluntarily reveal himself to the police. This argument is without merit. It is also noted that the instruction used the same or similar language as that of decisions of this court and the Louisiana Supreme Court, although not in the form of a jury instruction. See State v. Davies, 350 So.2d 586 (La.1977); State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.), writ denied, 619 So.2d 573 (La.1993); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.), writ denied, 508 So.2d 65 (La.1987).
Smith also objected to a portion of the following jury instruction:
When you retire to the jury room for your deliberations, you should first elect one of you to serve as foreperson. Then, you may deliberate or discuss or debate the evidence in trying to determine the facts and the applicability of the law given you by the Court. There are no limitations on your deliberations except you are confined to the evidence in the case and the law given you be the Court. However, when it comes time for you to decide on a verdict, each juror must arrive at his/her own individual and separate conclusion and must vote his/her separate and individual conscience.

(Smith R. pp. 80-81) (emphasis added). Smith argues that the use of the word "however" implied that the jury could ignore the *903 evidence and law and any limitations thereof, and instead convict him on a standard less than beyond a reasonable doubt.
When the entire text containing the word "however" is reviewed, it is clear that the instruction did not lead the jury to believe they had the power to nullify the reasonable doubt standard as Smith contends. In Daniels, supra, this court held:
A jury charge must be considered as a whole, and particular expressions in a charge must be construed in the context of the entire charge. A conviction will not be reversed on the ground of an erroneous charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial.
Id. at 113. It is clear from the context of this particular charge the trial court was instructing the jury that while there were certain actions which they were permitted to do as a group, each juror's verdict must be a decision he or she alone determines. There was nothing erroneous or prejudicial associated with the use of the word "however." Further, there were other portions of the jury instructions which indicate, if considered in a context along with the disputed portion, that there was no error or prejudice to defendant Smith. Specifically, the instructions provided: (1) none of the instructions could be singled out or considered to be of greater importance; (2) a lengthy discussion of the reasonable doubt standard; and (3) an explanation of the juror's role in determining the weight and credibility of evidence and witnesses (Smith R. pp. 72-74). This argument is also without merit.
Trial court's failure to sustain the defendant's request for a mistrial in regards to the dismissal of a juror and to inquire of the other jurors of threats they may have heard concerning the dismissed juror. (All defendants)
In this assignment of error, all three defendants argue that they were denied a fair trial as the result of the trial court's denial of their request for a mistrial after a juror was dismissed. During the trial, the judge received a letter from one of the jurors, Tawanda Haley, who was the only African-American member of the panel. All three of the defendants are also African-Americans. The text of the letter is as follows:
Judge Michael S. Ingram
I am writing with concern for my safty [sic] and well being. Meaning that, I don't want to be a victim of a crime. I have came [sic] in contact with some of the people involved in this case. Knowing that I know them and they know me, if the ruling isn't in their favor, they may try to do me body [sic] harm. Since I'm the only black chosen for the jury, I stand out. I will be a target in the black community, because I am the one and only black chosen for the jury. It is in my best interest and for my safty [sic] and well being to withdraw from the case. Please accept my letter of withdrawl [sic].
Sincerely,
Tawanda Haley
After receiving the letter, the trial court judge conferred with Ms. Haley and decided not to excuse her from the jury because all counsel did not consent. However, the state moved to have Ms. Haley removed from the jury for being unable to perform her duties and replaced with the alternate juror pursuant to LSA-C.Cr.P. Art. 789.[3] Ms. Haley then took the stand for questioning by the judge. Ms. Haley stated that when she walked through the halls during recesses, certain African-Americans would point at her and whisper. On the previous day, these same people were on Haley's bus as she rode home from the trial and again pointed at her and whispered. Ms. Haley also stated that her niece was sitting outside of the courtroom and overheard one of the defendant's mother say, "That black girl, she going [sic] to do whatever the white people say do." Ms. Haley testified that she believed she had been threatened. Further, when asked if she could continue to try the case in a just *904 and impartial manner, she replied that she could not. Finally, the judge asked Ms. Haley if she had told any of the other jurors about these events, and she said that she had not. Also, none of the other jurors had asked her any questions regarding this situation.
The trial court then ruled that Ms. Haley was unable to perform her duties as a juror, discharged her from the panel, and replaced her with an alternate. The defendants then moved for a mistrial pursuant to LSA-C.Cr.P. Art. 775, subsections (3) and (5) and the second paragraph of the article. They argued that it was unknown what the other jurors had seen or heard, especially if they had walked out of the courtroom behind Ms. Haley. The defendants argued that prejudicial conduct had occurred outside of the courtroom which made it impossible for them to obtain a fair trial. The trial court judge denied the motions for a mistrial, implying that none of the other jurors had reported any similar conduct. The judge also refused to question the remaining jurors. He ordered the jury sequestered for the remainder of the trial, although later such action was unnecessary because of the trial's early conclusion.
The crux of the defendants' argument is that a mistrial should have been granted because of the uncertainty as to what the other jurors saw, heard or perceived. Two of the defendants cite State v. Bean, 582 So.2d 947 (La.App. 2d Cir.), writ denied, 586 So.2d 567 (La.1991), where this court held:
A mistrial shall be ordered where prejudicial conduct inside or outside the courtroom makes it impossible to obtain a fair trial. LSA-C.Cr.P. Art. 775. It is a drastic remedy and should be declared only when unnecessary prejudice result to the accused. The determination of whether prejudice has resulted lies within the sound discretion of the trial judge.
Id. at 953 (citations omitted). However, this case supports the state's position, as it is submitted that the trial court judge was correct in not granting a mistrial.
Ms. Haley was the only minority member of the jury, and her testimony shows that the actions and comments were isolated incidents directed only at her. She stated that the individuals who were whispering and pointing at her were African-Americans. Further, the statement conveyed by her niece was also one specifically directed at her. Ms. Haley testified that she had not discussed her situation with any of the other jurors, and there was no evidence that they saw the pointing or overheard the whispering. Also, none of the jurors reported any such conduct to the trial court judge.
The defendants also raise the argument that the trial judge did not question the remaining jurors or admonish them. However, as the state points out, questioning the jury could have possibly tainted them. An admonishment was not proper either, as all of the discussion surrounding Ms. Haley's dismissal took place out of the presence of the jury. When the jury was finally brought back into the courtroom, the judge simply stated that the alternate was now a member of the jury. A mistrial was not necessary in this situation. This assignment is without merit.

Excessive/consecutive sentences. (Smith and Baker only)
In this final assignment of error, defendants Smith and Baker argue that the trial court erred in running their sentences for attempted second degree murder consecutive to their life sentence for the second degree murder conviction. In addition, Baker raises an argument of excessive sentence and presents some case law for this claim, but fails to argue why the sentence was excessive. Thus, it appears he is only raising the argument as to the consecutive nature of the sentences.
At the sentencing hearing, the trial court judge began noting that he had reviewed the pre-sentence investigation reports prepared for each of the defendants. He then discussed the facts of the case and the criminal history of each defendant. Both Smith and Baker were classified in grid cell 1A for the attempted murder conviction, for a period of incarceration ranging from 330 to 360 months. The trial court judge indicated that he had found no mitigating or aggravating *905 circumstances present. Thus, he stated that the only issue for determination was whether the sentences for each defendant should be imposed concurrently or consecutively with the mandatory life sentence for the second degree murder convictions. The judge stated:
In making the determination, the Court considered that [sic] fact that these offenses occurred within moments of each other and that more probably than not it was a continuous chain of events. But there were two and I had to balance that or counter that with the fact that there was one life taken and one life almost taken. As I said before, if Ms. Butler had been and [sic] inch or two in a different position she may well have died along with her companion. In that sense, there were two separate offenses and there were two victims (R. pp. 241-42).
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. LSA-C.Cr.P. Art. 883. It is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1168 (La. 1988).
When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms. State v. Green, 614 So.2d 758 (La.App. 2d Cir.1993). A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence of record. State v. Strother, 606 So.2d 891 (La. App. 2d Cir.1992), writ denied, 612 So.2d 55 (La.1993); State v. Thompson, 543 So.2d 1077 (La.App. 2d Cir.), writ denied, 551 So.2d 1335 (La.1989); State v. Lighten, 516 So.2d 1266 (La.App. 2d Cir.1987).
All factors are to be considered, State v. Ortego, 382 So.2d 921 (La.), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980); Derry, supra; and State v. Beverly, 448 So.2d 792 (La.App. 2d Cir.), writ denied, 450 So.2d 951 (La.1984). Among the factors to be considered are the defendant's criminal history, State v. Ortego, supra, State v. Jacobs, 493 So.2d 766 (La.App. 2d Cir.1986), the gravity or dangerousness of the offense, State v. Adams, 493 So.2d 835 (La.App. 2d Cir.), writ denied, 496 So.2d 355 (La.1986), the viciousness of the crimes, State v. Clark, 499 So.2d 332 (La.App. 4th Cir. 1986), the harm done to the victims, State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.), writ denied, 435 So.2d 433 (La.1983), whether the defendant constitutes an unusual risk of danger to the public; State v. Jett, 419 So.2d 844 (La.1982), defendant's apparent disregard for the property of others, State v. Parker, 503 So.2d 643 (La.App. 4th Cir.1987), the potential for defendant's rehabilitation, State v. Sherer, 437 So.2d 276 (La.1983), Lighten, supra, and whether defendant has received a benefit from a plea bargain, Jett, supra; Adams, supra.
It appears that the trial court judge based his determination as to the consecutive nature of these sentences largely upon his finding that there were two separate offenses and victims. However, in Lighten, supra, this court treated a conviction of two counts of simple robbery as arising from a single transaction. The defendant in Lighten accosted and robbed two victims of their wallets and money at the same time. Lighten, 516 So.2d at 1267-68. Thus, this court concludes that the drive-by shooting incident resulting in the second degree murder and attempted second degree murder convictions were offenses arising from the same act or transaction. Therefore, other justification was required from the trial court for imposition of consecutive sentences.
The record in this case amply supports the imposition of consecutive sentences for both defendants. Although the trial court judge did not specifically state that each defendant's criminal history was a reason for the consecutive nature of the sentence, the history was discussed at sentencing and is sufficient support. Smith had several prior felony and misdemeanor convictions, both as a juvenile and adult which resulted in his being both placed on probation and incarcerated. *906 He was also on parole at the time of the present offense. Baker also had several felony convictions as a juvenile and an adult, which resulted in his being placed on probation and incarcerated. Thus, it does not appear that either defendant benefitted from his previous periods of incarceration, probation, and parole. See, Lighten, supra, at 1268.
Additionally, this court notes that defendant Smith is correct in his argument that the trial court judge misstated the evidence as to Smith firing a gun. However, the above-discussed criminal history of Smith sufficiently supports the consecutive nature of the sentences regardless of this error on the trial court's part.

Error Patent Review
Defendant Baker's last assignment of error was a request for this court to review the record for errors patent. This request is unnecessary since such a review is made automatically in all criminal cases. State v. Stamper, 615 So.2d 1359 (La.App. 2d Cir.), writ granted on other grounds, 624 So.2d 1208 (La.1993). The sentencing judge failed to give defendants credit for any time served. LSA-C.Cr.P. Art. 880. Accordingly, this court orders that the sentence be amended to allow each defendant such credit. State v. Butler, 25,563 (La.App. 2d Cir. 01/19/94), 631 So.2d 22; State v. Hughes, 587 So.2d 31 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1197 (La.1992). Also, LSA-C.Cr.P. Art. 930.8 provides that at the time of sentencing, the trial court judge shall inform the defendant of the prescriptive period for post-conviction relief. The record shows that the judge did not inform the defendants. This defect has no bearing on the sentence and is not grounds to reverse the sentence or remand the case for resentencing. State v. Cox, 604 So.2d 189 (La.App. 2d Cir.1992); LSA-C.Cr.P. Arts. 921, 930.8(C). The district court is directed to give defendants written notice of the prescriptive period for applying for post-conviction relief within 10 days of the rendition of this opinion and is ordered to file defendants' receipt of such notice in the record of the proceedings. State v. Mock, 602 So.2d 776 (La.App. 2d Cir.1992); State v. Smith, 600 So.2d 745 (La. App. 2d Cir.1992).

DECREE
Thus, all three convictions and sentences are affirmed.
AFFIRMED.
BROWN, Judge, Concurring.
I agree in all respects with the well chosen words of the writer. I hope to strengthen our holding by presenting an additional rationale for the admissibility of the statement prompting the drive-by shooting.
Statements which are not hearsay include:
A statement by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy has been established. C.E. Art. 801D(3)(b).
A criminal conspiracy exists when two or more persons agree or combine for the specific purpose of committing a crime and act to further their intent. A conspiracy occurs even if the intended crime is consummated. LSA-R.S. 14:26.
A large number of people gathered in a field. At that gathering, an unidentified person stated: "Let's go down and do a drive-by on South 4th." Responding to this solicitation, a contingent of about 10 carloads drove to South 4th and returned to the field. Thereafter, a smaller group consisting of three carloads departed for South 4th and consummated the clear meaning of the words spoken in the field by killing one person and seriously wounding another.
A conspiracy is like a train. When these defendants stepped aboard, they became part of the crew and assumed responsibility for the intended crime. At the field there was a combination of people for the purpose of committing a drive-by shooting. Traveling to South 4th Street was an act in furtherance of that purpose.
Many of the conspirators were never known; however, it is not always necessary to identify the co-conspirator whose statement is introduced against his partners in *907 crime. If circumstances show that the unidentified declarant was a co-conspirator who made statements to further the purpose of the nefarious scheme, then those statements are admissible against all confederates. U.S. v. Dynalectric Co., 859 F.2d 1559 (11th Cir. 1988); U.S. v. Jennell, 749 F.2d 1302 (9th Cir.1984). This is true even if other members of the conspiracy were not present when the out-of-court declaration was made or whether they were even acquainted with each other. U.S. v. Moosey, 735 F.2d 633 (1st Cir.1984).
In our case, the unidentified declarant was clearly a part of a conspiracy with defendants to violently breach the peace. Thus, his statement to further that goal was not hearsay under C.E. Art. 801D(3)(b).
NOTES
[1] On June 1, 1994, this court, on its own motion, ordered that these appeals be consolidated because the issues arose from a joint trial of identical charges against the three defendants.
[2] The crime was committed on September 29, 1992, prior to the 1993 amendment to LSA-R.S. 14:30.1. This amendment added "drive-by shooting" to the second paragraph of the second degree murder definition which does not require intent to kill or inflict great bodily harm. Thus, the first paragraph was used in defining second degree murder to the jury.
[3] The jury was not present in courtroom for any of the discussion regarding the dismissal of Ms. Haley.