^LOBRANO, Judge.
The defendant, Chanda DeSilva, was charged with the first degree murder of Martin Hecker[1], a violation of La. R.S. 14:30. The State later amended the bill to charge the defendant with second degree murder, a violation of La. R.S. 14:30.1. Her first trial ended in a mistrial but in her second trial a jury found her guilty of manslaughter, a violation of La. R.S. 14:31. ■ The defendant was sentenced to serve twenty years at hard labor. She now appeals.
The facts of this case are as follows: Sometime after 4:00 a.m. on May 1,1994, Off. Dwight Powell, a grounds patrol officer in Armstrong Park, discovered Martin Hecker lying injured in the middle of the street at the intersection of St. Philip and Marais Streets. Hecker was lying facedown in the street, with his head pointing toward N. Rampart Street, and a gun was lying under his leg, near his left hand. Standing near Hecker’s head was the defendant, Chanda DeSilva. When questioned, Ms. DeSilva stated that someone had shot Hecker. Off. Powell called for assistance.
bAlthough Hecker was alive when Off. Powell discovered him, he died soon thereafter. An autopsy revealed the cause of death as a single gunshot wound to his left side, which injured his left lung, spleen, and aorta. The path of the bullet was downward and toward the back. The coroner testified that due to the lack of stippling, the weapon must have been at least twelve to eighteen inches from Hecker when he was shot. Although the coroner admitted thick clothing could impede the buildup of stippling on the skin if a weapon were fired at a closer range, when she viewed the victim’s shirt she indicated its thinness would not have impeded the deposit.
The defendant remained on the scene during the police investigation of the shooting. She told the officers initially responding to the incident that she had seen Hecker walking in the[1] area of St. Philip and N. Villere Streets. She ■ indicated she approached Hecker, told him he was in a dangerous area, and offered to lead him back to a safer area. She stated she was walking with him back down St. Philip, going toward the French Quarter, when they were 'approached by an unknown young black female, who pulled a gun. She stated Hecker and the woman struggled, and the gun fired twice.. She stat *46 ed Hecker gained control of the gun, and the female fled the scene, going toward N. Rampart Street. Hecker began following her and then collapsed in the street.
After the defendant concluded her statement, the officers placed her in their car in order to keep her isolated from other potential witnesses. After she had been inside the car for a short time, she motioned to one of the officers and gave him a wallet that she indicated belonged to the victim. She told the officer that she had taken the wallet after Hecker was shot because she feared someone else would Osteal it. Neither officer, however, remembered seeing the wallet in the defendant’s hand prior to that moment.
The defendant also spoke with two detectives from the homicide division who arrived some time after the victim was removed from the scene. She told the first officer substantially the same story, adding that the unknown female tried to rob Hecker prior to shooting him. She stated that the female fired a shot, demanded money, and then fired again, hitting Hecker. She then told the second homicide detective a similar story, but he became suspicious when she told him that the unknown female fled toward N. Claiborne Avenue, in the opposite direction from N. Rampart and from the direction that the victim’s body was positioned. The second detective also became suspicious because the defendant admitted she “hung out” in the area, but she claimed she did not know the shooter’s identity. After some questioning, she admitted she recognized the shooter as a juvenile nicknamed “Cocoa”. The detective advised her she was under investigation for the shooting,, advised her of her rights, and transported her to the homicide office.
Once there, the officers ran the nickname through the police computer and identified “Cocoa” as Michele Benjamin. The defendant further volunteered “Cocoa’s” address, which coincided with Ms. Benjamin’s address. The detectives compiled a photographic lineup containing Ms. Benjamin’s picture, which the defendant subsequently chose as portraying the female who shot Hecker. While at the homicide office, the defendant told the officers that she and Ms. Benjamin had met Hecker in the French Quarter the night before, and Hecker had asked Ms. Benjamin for a “date”. She stated Hecker was walking them home when Ms. Benjamin pulled a gun and tried to rob Hecker. She stated Ms. Benjamin fired the fegun, and Hecker grabbed the gun. The gun then fired a second time, striking Hecker in the side. The defendant insisted she did not know Ms. Benjamin was carrying a gun or that she was going to try to rob Hecker. The defendant refused, however, to make a formal statement.
Ms. Benjamin surrendered to the police later that day and gave a formal statement that was introduced at trial. In her statement, Ms. Benjamin insisted the shooting was accidental. She testified she met with the defendant at a gameroom in the French Quarter at approximately 11:30 the evening before the shooting. She and the defendant joined a group of friends in the Quarter, but the others left around 1:30 a.m., and the two girls continued to roam the Quarter, sharing a beer. They eventually met the victim, who told them he would walk them home. Ms. Benjamin stated that as they were walking, the victim told them his wife was in Germany, that he had no companion in New Orleans, and that he was looking for a “date.” Ms. Benjamin insisted she refused to be his date, and she dropped back behind the victim and the defendant. As they neared the corner of Marais and St. Philip, the victim produced a gun, and it discharged. She stated she was afraid he would shoot her, and she grabbed the gun. She stated she. and the victim struggled over the gun, and she kicked him in the groin. She stated she was able to turn the gun toward the victim, and the gun discharged again. She stated the victim “body-slammed” her to the ground. She stated she got up and ran from the scene. She denied taking anything from the victim, and she insisted no one discussed money. She also insisted neither she nor the defendant had a gun. When asked about the defendant’s purported statement where she indicated Ms. Benjamin produced a gun and tried to rob the victim, Ms. Benjamin insisted the defendant’s statements were lies. She stated she decided to surrender to the police when a friend told her she fehad seen a story on *47 television about the defendant’s arrest and the officers’ search for a sixteen-year-old who had been in the defendant’s company.
The detectives also took a statement at the scene from Mary Miller, a woman who lived near the scene of the shooting. Ms. Miller stated that she heard a man speaking loudly to a woman, and then she heard two gunshots. She stated she looked out her window and saw a man lying in the middle of the street, a woman fleeing toward Rampart Street, and another woman standing by Armstrong Park whose participation in the shooting was unclear.
The gun used in the shooting could only be traced to September of 1973, when it arrived in New Orleans in a store on Howard Avenue. No records of its whereabouts after that date existed.
The defense presented Althea Howard, who lived in an upstairs apartment at the corner of St. Philip and Marais. She testified that when she heard the gunshots, she went to her door and saw a young woman standing across the street who told her to call the police. She testified she became so nervous that she sat on her sofa and took some aspirin, and when she next looked outside the police had arrived. She could not identify the defendant as the person who told her to call the police, but she testified the same person who told her to call the police was later taken into custody by the police. She also testified she did not see anyone take the victim’s wallet, nor did she see a female running from the scene.
Otis Alexander, the defendant’s father, testified that his daughter was living with him in the 1600 block of N. Robertson at the time of the shooting. He indicated he did not know Ms. Benjamin, nor had he heard her name prior to the shooting.
It was stipulated that the victim’s blood alcohol level was .11 per cent.
hBy her sole assignment of error, the defendant contends there was insufficient evidence to support the verdict. Specifically, she argues the State failed to prove that she had either the intent to kill or inflict great bodily harm on the victim or the intent to engage in an armed robbery of the victim.
In State v. Egana, 97-0318 pp. 5-6 (La. App. 4 Cir 12/3/97), 703 So.2d 223, 227-228, this Court set forth the standard for an appellate review of the sufficiency of evidence to support a defendant’s conviction:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4th Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green, supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 at 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test •from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate ap *48 pellate review of whether a ^rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The defendant was charged with second degree murder and convicted of manslaughter. Second degree murder is defined in part by La. R.S. 14:30.1 as “the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2)(a) When the offender is engaged in the perpetration or the attempted perpetration of ... armed robbery ... even though he has no intent to kill or to inflict great bodily harm.” It is unclear under which subsection the State proceeded because the defendant was initially charged with first degree murder, which required both the intent to kill or inflict great bodily harm and that the killing be committed during the perpetration of armed robbery. It is unclear which element the State dropped when reducing the charge to second degree murder. The jury convicted her of manslaughter, which is defined by La. R.S. 14:31 as either a homicide which would be first or second degree murder but is committed in sudden passion or the heat of blood, or as a killing committed without any intent to cause death or great bodily harm when the offender is engaged in the perpetration or attempted perpetration of any felony not enunciated in the first or second degree murder statutes or any intentional misdemeanor “directly affecting the person.” Although the jury returned a responsive verdict, sufficient evidence to support the charged offense is deemed sufficient to support a responsive verdict, whether or not the evidence actually fits the elements of the responsive verdict, as long as the defendant did not object to the inclusion of the responsive verdict. See State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982)9[2]; State v. Schrader, 518 So.2d 1024 (La.1988); State v. Bowman, 95-0667 p. 10, fn. 3 (La.App. 4 Cir.7/10/96), 677 So.2d 1094, 1100[3]. Here, there is no indication the defendant objected to the inclusion of manslaughter as a responsive verdict. Thus, if the evidence presented at trial was sufficient to convict the defendant of second degree murder, her conviction must be affirmed.
All of the evidence presented at trial, including Ms. Benjamin’s statement, indicated the gun was in Ms. Benjamin’s hand when Hecker was shot. Thus, the State had to prove that the defendant was a principal to the shooting. In State v. Richardson, 96-2598 p. 7 (La.App. 4 Cir. 12/17/97), 703 So.2d 1371, 1374, this court discussed the proof of guilt as a principal:
La. R.S. 14:24 provides: “All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” In order to support a defendant’s conviction as a principal, the State must show that the defendant had the requisite mental state for the crime. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Hampton, 94-1943 (La.App. 4th Cir.12/27/96), 686 So.2d 1021, writ denied, 97-0166 (La.6/13/97), 695 So.2d 986.
The defendant argues the State failed to prove she had either the specific intent to kill or inflict great bodily harm on the victim, or that she had the intent to participate in an armed robbery of the victim which resulted in the victim’s death. The evidence introduced at trial did not prove her intent to kill or inflict great bodily harm. Thus, this Court must determine whether there was evidence to show her intent to participate in the armed robbery that resulted in the victim’s death.
hoThe defendant argues the evidence shows she was not aware Ms. Benjamin was intending to rob the victim as he walked with them. In support of her argument, she cites State v. *49 Dozier, 553 So.2d 911 (La.App. 4 Cir.1989)[4], where this court reversed the defendant’s manslaughter conviction. The victim and the co defendant had argued and fought earlier on the morning of the shooting. At the time of the shooting, the eodefendant’s car was blocking the victim’s car, and the codefend-ant ignored the victim’s request to move the car. The victim then punched the codefend-ant, and the defendant, who was in the code-fendant’s ear, pulled a gun and pointed it first at the victim’s brother and then at the victim. The defendant and the victim began arguing, and the co defendant pulled a gun and shot the victim. On review, this court reversed the defendant’s manslaughter conviction, finding the State failed to show that the defendant had any knowledge that the co defendant was going to shoot the victim. This court also found that the defendant’s actions, including pulling the gun, were consistent with a claim of self-defense, including his belief that the victim’s brother', was going to jump him.
In State v. Wiley, 95-396 (La.App. 3 Cir. 3/20/96), 672 So.2d 185 [5], also cited by the defendant in this case, the defendant and the codefendant were both fifteen-year-pld runaways. They stopped at the victims’ house to use the telephone and get some water. While on the porch, the codefendant told the defendant he was going to kill the victims. She replied, “No.” The codefendant fatally shot one victim on the porch, entered the house and fatally shot a second victim, and then chased and shot at a third victim, who escaped. The defendant fled with the code-fendant and threw the codefendant’s gun out of the window of the victims’ Iqstolen truck. On appeal, the court reversed the defendant’s conviction, finding that the State failed to prove that the defendant knew the code-fendant was going to commit the robbery and killings. The court noted the victim told the codefendant “no” when he stated he was going to kill the victims, that she stayed on the porch while he was committing the crimes inside the house, and that she refused to get the keys to the victims’ truck. The court noted the defendant’s actions at best would support an accessory conviction.
The defendant also cites State v. Smith, 26,661, 26,622, and 26,263 (La.App. 2 Cir. 3/1/95), 651 So.2d 890[6], where the three defendants were involved in a drive-by shooting which left one person dead and one person injured. On appeal of their murder and attempted murder convictions, the court found sufficient evidence to support each conviction. All three defendants were present at a party earlier in the evening when the drive-by shooting was suggested. All three defendants were in the ears used in the shooting, and two of the defendants were seen with guns just prior to the shooting. The third defendant was driving one of the ears and had dropped off his girlfriend just prior to driving to the scene of the shooting. The court found that the evidence of the gun possession by two of the defendants just prior to the first shot being fired, and the eyewitness testimony that one of them actually fired his gun, was sufficient to support the convictions of both of those defendants. With respect to the driver, the court found he was a principal to the shooting, noting that he knew about the shooting plan, he agreed to turn off the lights in his car as he neared the scene, and he saw one of the other defendants with a gun in his car just prior to the shooting.
bln State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, in a per curiam opinion, the Supreme Court reversed the defendant’s manslaughter conviction. The defendant was in a van in which two co defendants put the barely-alive victim after raping and severely beating him. The co defendants eventually stopped the van, removed the victim from the van, beat him to death, and left him on the side of the highway. The Court found that this evidence did not show that the defendant counseled or procured the others to kill the victim or that he participated in the murder, and thus he could not be convicted as a principal to the killing.
*50 In State v. Bellamy, 599 So.2d 326 (La.App. 2 Cir.1992)[7], the defendant was identified as the man seen standing nearby and looking around while two armed men ran from the shadows and robbed the victim. The defendant and the two other men then fled together. The defendant admitted he was with the two robbers prior to, during, and after the robbery, but he claimed he did not know they were going to rob the victim. On review, the court rejected this argument, finding the defendant’s actions showed he was the lookout for the other robbers.
In State v. Marshall, 94-1282 (La.App. 4 Cir. 6/29/95), 657 So.2d 1106, the defendant and another man were seen together at the time and place of the shooting. Both the defendant and the other man were armed, and one witness saw the other man shoot the victim. Some witnesses testified they heard two guns being fired. The defendant and the shooter fled together. On appeal, this court found this evidence showed the defendant was a principal to the shooting, even though the State was unable to prove that he fired the fatal shot.
h3In State v. Jasper, 28,187 (La.App. 2 Cir. 6/26/96), 677 So.2d 553[8], the defendant and another man had argued earlier in the evening, and then the armed defendant was seen with a group of men who fired on a car in which the other man was riding. The defendant was seen firing shots at the fleeing car. The bullets missed the occupants of the car and struck a bystander, who was fatally wounded. On appeal, the court upheld the defendant’s conviction as a principal to the shooting, noting that the defendant joined the others in shooting at the car.
Here, the defendant contends the State failed to prove that she was aware of Ms. Benjamin’s intent to rob the victim. The jury heard one detective testify that she told him that she was unaware that Ms. Benjamin was armed or that she intended to rob the victim. However, the jury also heard that the defendant changed her story several times concerning the shooting, at first stating she was trying to lead the victim out of a dangerous area when he was shot by an unknown female, then stating that she recognized the female, then admitting that she and Ms. Benjamin were walking with the victim, whom they had picked up in the French Quarter, when Ms. Benjamin tried to rob the victim and shot him during the robbery.
Unlike many of the cases cited herein, the defendant did not flee with Ms. Benjamin after the shooting. Instead, she stayed with the victim. However, given the fact that Ms. Miller and Ms. Howard saw her on the scene just after the shooting and that Officer Powell apparently came upon the shooting scene shortly after it happened, it is very plausible that she considered it safer to remain on the scene, especially considering her initial statement that she was not involved in the shooting and was merely trying to lead the victim to safety when he was shot. In ^addition, her claim that she was not near the victim when the shooting occurred was not supported by Ms. Miller’s statement. According to the detective’s testimony concerning the statement, Ms. Miller indicated she did not look out her window until after both shots were fired, and at that point a female (supposedly Ms. Benjamin) was already fleeing toward Rampart Street. By that time, a reasonable conclusion was that the defendant had moved away from the victim.
Furthermore, the defendant’s claim that she was not involved in the shooting might have had more credibility if she had not taken the victim’s wallet. The defendant contends that she just took the wallet for safekeeping. However, she did not turn over the wallet to the first, the second, or even the third officer who arrived on the scene. Instead, she waited until the officers had placed her in their vehicle after she gave her initial statement before surrendering the wallet. Contrary to the defendant’s argument, the jury could very well have concluded that the defendant intended to keep the wallet and then surrendered it only after being detained by the police.
The defendant argues that it was just as likely that she took the opportunity to *51 take the victim’s wallet after he had been shot and Ms. Benjamin fled. Apparently, the jury rejected this hypothesis. A factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Morgan, 94-2586 (La.App. 4 Cir. 3/14/96), 671 So.2d 998[9]; State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). Given the facts of this case and the defendant’s multiple versions of how the shooting occurred, we do not find that the jury abused its discretion by rejecting the defendant’s claim that she did not know Ms. Benjamin planned to shoot and rob the victim. Therefore, we conclude that hsthe State presented sufficient evidence to support the initial charge of second degree murder, and thus under Elaire and Bowman, the evidence supports the lesser included verdict of manslaughter. This assignment has no merit.
Accordingly, we affirm the defendant’s conviction and sentence.
AFFIRMED.

. Charged in the same bill was Michele Benjamin, who was ultimately convicted in a separate trial of second degree murder. Her conviction and sentence were affirmed in an unpublished opinion, State v. Benjamin, 96-1283 (La.App. 4 Cir.9/23/98), -So.2d -.

. Cert. den. 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983).

. Writ den. 96-2070 (La. 1/31/97), 687 So.2d 400.

. Writ den. 558 So.2d 568 (La. 1990).

. Writ den. 96-0851 (La. 10/4/96), 679 So.2d 1377.

. Writ den. 95-0918 (La.9/15/95), 660 So.2d 458.

. Writ den. 605 So.2d 1089 (La.1992).

. Writ den. 96-1897 (La.2/21/97), 688 So.2d 521.

. Writ den. 96-0975 (La.9/27/96), 679 So.2d 1359.