# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00913-COA

**KADARIUS WHITE**                                                              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/18/2015 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA MCCLINTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT I, ARMED ROBBERY; COUNT II, ARMED CARJACKING; COUNT V, ARMED ROBBERY; COUNT VI, ARMED CARJACKING; COUNT IX, POSSESSION OF STOLEN PROPERTY; AND SENTENCED TO TERMS OF TWENTY-FIVE YEARS EACH ON COUNTS I, II, V, AND VI AND TEN YEARS ON COUNT IX, ALL TO BE SERVED CONCURRENTLY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | REVERSED AND REMANDED - 08/01/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1. Kadarius White was indicted and tried in the Hinds County Circuit Court on four counts of armed robbery, four counts of armed carjacking, and possession of stolen property.

The charges arose from five separate incidents. Following a jury trial, White was convicted of two counts of armed robbery, two counts of armed carjacking, and possession of stolen property. He was sentenced to four terms of twenty-five years and one term of ten years, all to be served concurrently in the custody of the Mississippi Department of Corrections.

¶2. On appeal, White raises eight issues. We conclude that White is entitled to a new trial based on his first issue: a clear discovery violation by the State followed by the denial of White's request for a mistrial or continuance. Just prior to opening statements, the district attorney disclosed that the State possessed approximately ninety-five minutes of recorded phone conversations involving White, and the State intended to introduce unspecified parts of the recordings, including an alleged "confession," into evidence at trial. The recordings had been in the State's possession for two years, but despite a specific discovery request by White, the State had failed to disclose their existence. The trial judge delayed opening statements just long enough for White's attorney to listen to the recordings but denied White's request for a continuance or mistrial. Given the State's clear violation of the rules of discovery and the importance of the evidence, we conclude that the denial of a continuance or mistrial was an abuse of discretion, that the error was not harmless, and that White is entitled to a new trial.

¶3. Since White's first issue requires a new trial, we need not address the other grounds on which White seeks a new trial. We do address White's speedy-trial and sufficiency-of-the-evidence arguments because these claims, if successful, would prevent further

2

prosecution of White on some or all counts. However, White waived his statutory right to a speedy trial, and there was sufficient evidence to sustain convictions on the relevant counts. Accordingly, we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶4. In August 2013, a Hinds County grand jury returned a nine-count indictment against White. The indictment alleged as follows: On April 7, 2013, White used a gun to take Scott Penman's wallet and cell phone (Count I – armed robbery) and white Toyota Corolla (Count II – armed carjacking). On April 22, 2013, White used a gun to take Shelley Davis's purse (Count III – armed robbery) and Jeep Cherokee (Count IV – armed carjacking). On April 22, 2013, White also used a gun to take LaQuinta Thomas's purse (Count V – armed robbery) and Honda Civic (Count VI – armed carjacking). On April 23, 2013, White used a gun to take Destiny Taylor's wallet and cash (Count VII – armed robbery) and Ford Fusion (Count VIII – armed carjacking). And on April 24, 2013, White possessed a Hyundai Sonata that had been stolen from Tabitha Bailey and that White knew or had reasonable grounds to know that the vehicle was stolen (Count IX – possession of stolen property).

*Witness Testimony and Physical Evidence*

¶5. At trial, Penman testified that he returned to his home in the Fondren area of Jackson around 8 p.m. on April 7, 2013. As he was still seated in his car, a man appeared next to the car, pointed a gun at him, and demanded his keys, wallet, and cell phone. Penman complied, and the man drove away in Penman's white Toyota Corolla. Penman identified White in a

3

photo lineup and at trial as the man who robbed him. Penman also testified that a day or two after the incident, he received an email from an "app" on his cell phone ("Lookout") notifying him that his phone was in the vicinity of 932 or 933 Carnation Drive in Jackson.[1] Detective Melvin Williams of the Jackson Police Department (JPD) later testified that White lived at 933 Carnation Drive. Penman's cell phone was never recovered.

¶6. Between 10 and 10:30 p.m. on April 22, 2013,[2] Davis drove up to the Willow Point Apartments in Jackson, where she lived at the time.[3] Davis testified that when she exited her vehicle, a man snatched her keys from her hand, pointed a gun at her face, and then snatched her purse from her. The man then left in her vehicle, a Jeep Cherokee. Davis identified White in a photo lineup and at trial as the man who robbed her.

¶7. Around 11:10 p.m. on April 22, 2013, Thomas drove up to the Willow Creek Apartments in Jackson, where she lived at the time.[4] Thomas testified that she parked on the street in front of the apartments, and as soon as she got out of her car, a man approached her with a gun drawn. He ordered her to put her purse and another bag back in her car, and she

---

[1] The trial judge overruled White's objections that Penman's testimony was "scientific evidence" and that the State had not shown that "how the app works or whether's it's reliable [or] what the app even is."

[2] Davis testified at trial that the incident occurred around 11:20 or 11:30 p.m. However, JPD Detective Kenneth West testified that the crime was reported at 10:27 p.m.

[3] The Willow Point Apartments are located on Glencross Drive, west of State Street, between Beasley Road and County Line Road.

[4] The Willow Creek Apartments are located off of Edgewood Terrace, just west of I-55, near McWillie Elementary School.

complied. He also took her keys. The man ordered Thomas to lie on the ground, but she ran toward her apartments instead. The man then left in Thomas's vehicle, a Honda Civic. Thomas identified White in a photo lineup and at trial as the man who robbed her.

¶8. Taylor testified that around 9 or 10 p.m. on April 23, 2013, she went to visit a friend, Milton Miller, at his house on Lorenz Boulevard in Jackson. Taylor and Miller drove to a store and then returned to his house. As they were sitting in Taylor's car in the driveway, a man with a bandanna over his mouth appeared at the window with a gun and ordered them out of the car. After Taylor and Miller exited the car, the man's bandanna slipped down so that Taylor could see his face. The man then drove away in Taylor's car, a Ford Fusion. Taylor's wallet, which contained $300, was in the backseat. Taylor identified White in a photo lineup and at trial as the man who robbed her. Detective Williams testified that White and Devontae Stamps were later arrested together as codefendants on a "different charge," and Stamps had Taylor's social security card "in his pocket or on his person."

¶9. Taylor also testified that immediately after the robbery, Miller made a phone call to someone, though she did not know who, and her car was returned about forty-five minutes later. The person who returned her car was not the person who robbed her but "[s]omebody totally different," who she did not know. At trial, JPD witnesses identified the man who returned the car as Dewan Adams. After the State rested, Adams was called as a defense witness. He testified that when Miller called him, "I told him I ain't know who robbed him. What I did I went and got the car. . . . I got the car from Vontae." Adams testified that he

5

did not know Vontae's last name but only knew him in "the neighborhood by Vontae." Adams testified that Vontae was alone when he brought Adams the car. Adams also testified that he did not know White. On cross-examination, Adams acknowledged that he later met White in jail and that White was upset that Adams's name came up in the case.

¶10.    Bailey testified that between midnight and 1 a.m. on April 22, 2013, she drove a friend, Courtney Younger, to the Camelot Apartment Complex on Robinson Road in west Jackson. Bailey's daughter and Younger's three-year-old son were also in the vehicle, a Hyundai Sonata. When Bailey and Younger exited the Sonata, "two young men" approached them with guns drawn. One of the men put his gun to Bailey's chest, and the other put his gun to Younger's head. The men took the women's purses and were about to drive away in the Sonata with Younger's son still inside. The women begged the men to allow them to get the child out of the vehicle, and the men allowed them to do so and then drove away. Bailey could not identify either of the men, who were wearing hoods.

¶11.    JPD recovered Bailey's car two days later after a car chase. White and Stamps were arrested after they abandoned the car and fled on foot. Detective Williams testified that Younger identified Stamps as one of the two men who had robbed her and Bailey.

¶12.    In his closing argument, defense counsel argued that the victims had given police physical descriptions of the perpetrator(s) that did not match White. Whereas White was approximately 5'3" and 120 pounds, the perpetrator was, according to various witnesses, between 5'6" and 6'0" and between 140 and 200 pounds. Defense counsel also argued that

6

the witnesses had given differing descriptions of the gun(s) displayed in the various incidents, and no guns were ever recovered. Finally, defense counsel emphasized that the vehicles belonging to Penman, Thomas, Taylor, and Bailey were all recovered and some or all were tested for fingerprints and other forensic evidence, but no physical evidence linking White to those vehicles was recovered.

*Recordings from the Simpson County Jail*

¶13.    In addition to the testimony of the victims and JPD detectives and officers, the State introduced into evidence five excerpts of recorded phone conversations placed by White from the Simpson County Jail. As noted above, White was arrested in Jackson on April 24, 2013, but for reasons that are unclear, he was taken to the Simpson County jail shortly thereafter. Within a few days of White's arrest, Captain Fred Williams of the Simpson County Sheriff's Department obtained recordings of phone calls placed by White from the jail to an unidentified female. Captain Williams notified JPD Detective Williams of the evidence, and Detective Williams and Detective West promptly traveled to Simpson County to retrieve the recordings. Detective Williams testified that he recognized White's voice on the recordings, and he and Detective West recognized that the evidence was relevant and significant to their investigations of the crimes at issue in this appeal.

¶14.    In August 2013, the grand jury indicted White, and in January 2014, White filed a motion for discovery that specifically requested "[a]ll written or recorded statements (or copies), and the substance of any oral statements, relevant in any way to the alleged crimes,

7

made by [him]." However, the State never disclosed or produced the recordings from the Simpson County jail.

¶15. The case finally proceeded to trial in May 2015, more than two years after White's arrest and approximately sixteen months after his motion for discovery. On Monday, May 4, 2015, a jury was selected. At the end of the day, the judge told the jurors and the parties to report back ready to begin trial at 9 a.m. The next morning, just before opening statements, the district attorney announced: "This morning, Your Honor, we received a CD . . . where Mr. White was recorded from the Simpson County jail speaking to his girlfriend, and he also basically confessed to committing certain crimes in this case. The defendant did not get this because we just received [it] this morning." In response to the judge's questions, the district attorney admitted that although he claimed that *he* had "just received" the CD, it had been in Detective West's possession for two years. Defense counsel informed the judge that the district attorney's announcement was the "first time" he had heard about the CD, and he asked for ten or fifteen minutes to listen to it. The judge then granted a fifteen-minute recess to allow defense counsel to listen to the recordings.

¶16. After the brief recess, defense counsel reported that he had not had time to listen to the entire CD because it contained seven recorded phone calls totaling about 157 minutes.[5] After further discussion, the judge ordered an additional recess until noon to allow counsel to listen to the entire CD. Following that recess, counsel disputed the district attorney's

---

[5] The actual total length of the conversations is around ninety-five minutes. The recordings are not high quality, and the conversations are difficult to understand.

characterization of the recordings as a "confession." Counsel also argued that the recordings should be excluded because the State had committed a blatant discovery violation in failing to disclose evidence that it had possessed for over two years. Finally, he argued that if the evidence was not excluded, White was entitled to "a mistrial . . . or alternatively a continuance for a period of time for us to reevaluate how we would proceed."

¶17. The district attorney responded that the recess had given White "adequate time to review [the] evidence." However, the district attorney also stated that if the court found that White had been "surprised," then the State should at least be allowed to use the recordings in rebuttal if White chose to testify. The district attorney further stated that if the court was "considering a continuance," then the State would withdraw the evidence.[6] The district attorney also argued that the State's failure to disclose the recordings was unintentional and a mere "oversight due to the number of robberies that were taking place where [White's] name kept coming up time and again." He stated, "[T]here [were] certain cases that [were] related to each other, and this tape was a part of a number of investigations, so when the police discovered the tape, they immediately turned it over . . . ."

¶18. After hearing argument, the judge ruled that the trial would start as soon as the jury

---

[6] *See* URCCC 9.04(I)(3) ("The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.") (replaced by MRCrP 17.9(b)(3)). The Mississippi Rules of Criminal Procedure went into effect July 1 of this year. Rule 17.9 is based on former Rule 9.04 of the Uniform Rules of Circuit and County Court, which was in effect when White was indicted. MRCrP 17 cmt.

returned from lunch and that the recordings would be admitted if the State could lay a proper foundation. The judge acknowledged that he had not listened to any part of the CD and thus was unfamiliar with the specifics of any of the recorded conversations. Nonetheless, he ruled that White's motion to exclude the evidence or for a mistrial or continuance would be denied because White was given "an opportunity to review the evidence" during the recess.

¶19. On the afternoon of the second day of trial, Wednesday, May 6, 2015, during the testimony of Detective Williams, the State indicated that it was ready to introduce excerpts of the recordings to be played for the jury, but the State still had not identified the specific portions it intended to offer. Therefore, the court recessed the trial for the day and instructed the parties to confer that afternoon and be ready to resume trial at 9 a.m. the following morning. However, on Thursday, May 7, defense counsel informed the court that the State did not provide a list of excerpts until 8:59 a.m. that morning, so he had not had an opportunity to listen to the five specific excerpts (about fifteen minutes of recordings in total) that the State intended to introduce. After another brief recess, the five excerpts were played for the jury and introduced into evidence.

¶20. In the first excerpt, White gives an unidentified woman directions to a house on Memphis Street.[7] He tells her that she will find "two guns under" some shingles piled in the backyard of the house. He tells the woman, "Get both of them and take them to your house and put them up." White also tells her to "[c]all Islam," meaning Islam Wilson. White

---

[7] White was arrested in the vicinity of Memphis Street.

seems to say that one of the guns belongs to Islam, but he tells the woman not to give Islam the gun. White continues:

> Tell Islam I said just like this. Tell him I said he gotta come down here and hold up for that . . . white Toyota Corolla[8] that he got cause they trying to put it on me. . . . They trying to charge me with the car Islam got. . . . [T]hey trying to charge me with armed carjacking too for Islam's robbing those dudes with a gun. . . . [H]e gotta come hold up for that . . . . I ain't fixin to hold up for no carjacking I ain't actually did.

A different male voice can be heard on the recording, and White tells the woman that "Vonte" (Stamps) is there with him. Stamps seems to express agreement with White that Islam needs to come "hold up" for one or more crimes, or else Stamps would have to implicate Islam, and Stamps did not want to be a "snitch machine."

¶21.	In the second excerpt, the woman apparently is at the house on Memphis Street. She finds one of the guns, a black gun, but cannot find the second one. White can then be heard saying, "Vonte, where the other gun at? . . . She got one of them. She got the Ruger, the one I put up. She can't find the other one." White then tells the woman that the other gun is "under that first pile," and she finds it. White asks if she has talked to "little Islam," and the woman says, "Yeah, but he ain't telling me nothing good. He said he ain't want to do it."

¶22.	In the third excerpt, which is not entirely audible, White discusses being arrested with Stamps after they fled from Bailey's car. The woman says that she talked to Islam and "[h]e was trying to get a gun." She says, "He asked for that other one. He don't know I got them other two. He just know I got your nine."

---

8 Recall that a white Toyota Corolla was taken from Penman.

11

¶23. The fourth excerpt includes the following exchange, seemingly referring to Bailey's Hyundai Sonata, the subject of Count IX of the indictment:

White: First I got to get that other charge off of me. When I get the other off my bond ain't gonna be shit [inaudible] for sitting in the car with her. That ain't shit. That's just possession of stolen property.

Woman: So you wasn't driving?

White: Nah. I was but they don't know that. They don't know who was driving . . . . They just charged me for being in the [car]. They charged Vonte with getting that [car] with armed robbery.

Woman: So how long he gotta be in there?

White: I don't know. He ain't going nowhere.

¶24. Finally, in the fifth excerpt, the woman tells White that a woman named "Kiara" is going to help her deal with Islam. The woman had called Islam again, but he hung up on her. She tells White, inter alia, "I'll set his ass up and let the police get him" and "I'll set his ass up real quick and still don't know anybody know I did it." White responds, in part, "That's the only way I'm going to get out, that's the only way I'm gonna get my bond back . . . . [A] motherfucker trying to take me off these streets for the shit I ain't did. If I would have did shit, I'm gonna hold up for my shit cause I'm out here doing this shit, you feel me."

¶25. The defense called Islam as a witness at trial. Islam testified that he was 5'8" and 150 pounds. Islam then "pled the Fifth" when asked if he was the person who robbed and carjacked Penman, Davis, Thomas, and Taylor, and also in response to most of the State's questions on cross-examination. In his closing argument, the district attorney asserted that

12

Islam "is in jail for murder." White objected, and the judge sustained and instructed the jury to disregard the prosecutor's statement.

¶26.  White had also filed a pretrial motion for a ruling on the admissibility of a what he claimed was a secretly recorded conversation between him and Islam. White alleges that Islam made inculpatory statements and essentially admitted his guilt on the call. However, the trial judge concluded that too little of the recording was audible to establish a proper context and relevance; the judge also concluded that the recording was hearsay and could not be authenticated properly.

*Verdict and Sentencing*

¶27.  The jury returned guilty verdicts on Counts I and II (armed robbery and armed carjacking of Penman), Counts V and VI (armed robbery and armed carjacking of Thomas), and Count IX (possession of stolen property – Bailey's Sonata). The jury indicated that they could not agree on Counts III and IV (armed robbery and armed carjacking of Davis) and Counts VII and VIII (armed robbery and armed carjacking of Taylor), and the trial judge declared a mistrial on those counts. The trial judge subsequently sentenced White to terms of twenty-five years each on Counts I, II, V, and VI, and ten years on Count IV, with all sentences to be served concurrently. White filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

**DISCUSSION**

¶28.  On appeal, White raises eight issues. For the reasons that follow, we reverse and

13

remand for a new trial on the first issue that White raises: the denial of his motion for a mistrial or a continuance based on the State's failure to disclose the Simpson County jail recordings. We also address White's speedy-trial and sufficiency-of-the-evidence claims and find those issues to be without merit. As White's first issue requires a new trial, we need not address his remaining new trial arguments.

### I. *Discovery Violation/Denial of a Mistrial or Continuance*

¶29. As discussed above, the State committed a clear discovery violation in this case by failing to disclose recordings of phone calls that White made from the Simpson County jail after his arrest. The recordings were in the State's possession for over two years and were covered by White's discovery requests, but the State failed to disclose their existence until just before opening statements, after the jury was already selected. "[T]his is precisely the sort of 'trial by ambush' that Mississippi has endeavored to outlaw." *Fulks v. State*, 18 So. 3d 803, 805 (¶9) (Miss. 2009). The recordings should have been excluded or a mistrial or continuance granted to allow White a reasonable opportunity to prepare to meet the newly disclosed evidence. Instead, defense counsel had to give his opening statement after being afforded just enough time to listen to ninety-five-plus minutes of garbled recordings that should have been produced at least sixteen months earlier. We conclude that this issue requires reversal and a new trial.

### A. *The State committed a clear discovery violation.*

¶30. "The discovery rules apply to both the defendant and the State. The essential purpose

14

of Rule 9.04 of the Uniform Rules of Circuit and County Court Practice is the elimination of trial by ambush and surprise." *Norris v. State*, 735 So. 2d 363, 365 (¶7) (Miss. 1999) (citing *Robinson v. State*, 508 So. 2d 1067, 1070 (Miss. 1987)). Our Supreme Court has explained that "[d]isclosure is the hallmark of fairness and the quest for justice that should be the goal of the criminal justice system." *Robinson*, 508 So. 2d at 1070. To that end, Rule 9.04 requires the prosecution to disclose any recorded statements of the defendant upon request. URCCC 9.04(A)(2). Such a request was made in this case, and the State clearly failed to comply with its discovery obligations.

¶31. The district attorney's only excuse for the violation in this case—that, due to "oversight," detectives did not provide the evidence to him until after jury selection—is inadequate as a matter of law. As Justice Robertson explained over thirty years ago in *Box*:

> Another familiar excuse is that the police had the information but the prosecuting attorneys were not aware of it. This will not do. When police officers have been in possession of discoverable information for nine months, the State is entitled to no consideration because the District Attorney or his assistant did not look at the file until the night before trial. The State, in the present context, is a team consisting of the attorney, the law enforcement officers of the jurisdiction in which the case is brought, all other cooperating law enforcement officials . . . , and any other persons cooperating in the investigation and prosecution of the case. What is known or available to any one or more is deemed known by or available to the State. All are collectively "the State" for present purposes. . . . When responding to requested or ordered discovery . . . , the State, as here collectively defined, should disclose all information it has plus all information it could obtain with due diligence or upon reasonable inquiry.

*Box v. State*, 437 So. 2d 19, 25 n.4 (Miss. 1983) (Robertson, J., specially concurring); *accord King v. State*, 656 So. 2d 1168, 1174-76 (Miss. 1995). For purposes of this case, "the State"

certainly included the lead detectives on the case, who were in possession of the CD for two years before it was produced just as trial was about to start. As Justice Robertson put it, "This will not do."

¶32. Moreover, the explanation given for the discovery violation does not hold up. The district attorney claimed that the CD was overlooked because it was "part of a number of investigations," all related and involving White. In other words, the CD was relevant to so many cases that the State forgot that it should be produced to the person recorded, who was under indictment in five such cases. Even White's specific discovery request in January 2014 did not prompt the State to correct this regrettable "oversight." Only sixteen months later, after a jury was selected and just prior to opening statements, did the State suddenly realize that it should turn over the CD to White. It is difficult to imagine a clearer violation of Rule 9.04.

> B. *The denial of a mistrial or continuance was an abuse of discretion.*

¶33. Rule 9.04(I) provides as follows:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> > 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
> >
> > 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court

16

shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.

3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

URCCC 9.04(I).

¶34. As applied to this case, the rule *required* the court to "exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial." *Id.* Obviously, the court did not exclude the evidence or grant a mistrial, so the only issue is whether the two recesses just prior to opening statements provided "a period of time reasonably necessary for the defense to meet the non-disclosed evidence." *Id.* The State argues that the denial of a mistrial or a continuance was not an abuse of discretion because the recesses were long enough for White and his attorney to listen to the recordings. We cannot agree.

¶35. The State's discovery violation in this case "produced the same result as that which drew the *Box* Court's condemnation: a trial by ambush in which critically important evidence was sprung on a defendant with such abruptness that defense counsel had time neither to investigate its veracity nor to make meaningful preparation to meet it." *Fulks*, 18 So. 3d at 805 (¶8) (ordering a new trial because defendant was denied a continuance when, the day prior to trial, the State disclosed that a key witness had changed his testimony to implicate the defendant). Our Supreme Court has repeatedly held that in such a case, the defendant is

17

entitled to a continuance or mistrial if the critical evidence is not excluded or withdrawn. *See Norris*, 735 So. 2d at 364-65 (¶¶3-8) (ordering a new trial because the defendant was denied a continuance after the State disclosed twenty-five witness statements the day before trial); *Galloway v. State*, 604 So. 2d 735, 740 (Miss. 1992) (ordering a new trial because the defendant was denied a continuance after the State disclosed a surprise witness during trial); *Reuben v. State*, 517 So. 2d 1383, 1385-87 (Miss. 1987) (ordering a new trial because the defendant was denied a continuance after the State disclosed a key new witness three days prior to trial); *see also Mims v. State*, 730 So. 2d 76, 78-80 (¶¶3-6) (Miss. Ct. App. 1998) (ordering a new trial because the defendant was denied a continuance after the State disclosed on the morning of trial that his former girlfriend would testify against him).

¶36.    The discovery violation in this case was of a comparable significance.  It is evident that part of defense counsel's trial strategy had been to emphasize the State's inability to link White to any gun or guns used in the carjackings.  Indeed, defense counsel questioned the State's witnesses on this point and made the argument even after the Simpson County recordings were disclosed.  Needless to say, however, the recordings seriously undermined this strategy.  The recordings enabled the district attorney to respond in closing argument:

> I want you to listen to those audiotapes regarding those guns.  It's going to be the first two messages because all of us heard defense [c]ounsel [questioning] the police officers from the stand, well, did you recover[] any weapons?  The victims talk about with silver gun and black gun.  Did you recover and [sic] weapons?  No.  But we know they didn't recover any weapons, because Kadarius White hid them in the house off Miller Street. That's where he sent his girlfriend to. . . .  [White told her to] [g]o put them up. Make sure don't nobody get them.  We know why we didn't find the guns.  They made sure we

18

didn't find them. He hid behind the house and he says that. Question answered. Problem solved.

¶37. The prosecution placed great emphasis on the recordings and discussed their contents at length during closing argument. In addition to using the recordings to tie White to guns matching the victims' descriptions, the district attorney argued that other parts of the recordings amounted to a "confession" and showed that White was scheming to "set up" Islam Wilson for the crimes. The district attorney's interpretation of the recordings is open to debate. However, it is evident that these were not issues or arguments that White expected to have to address based on the information that the State had produced in discovery. Put simply, White was "ambush[ed]" with "critically important evidence" that should have been disclosed sixteen months earlier. And he was then afforded no opportunity "to make meaningful preparation to meet it." *Fulks*, 18 So. 3d at 805 (¶8). White was entitled to a continuance or mistrial, and the denial of both was an abuse of discretion.

### C. The error was not harmless.

¶38. On appeal, "the State does not concede that a discovery violation occurred"[9] but argues that "even if the Court finds that there was a discovery violation, the . . . denial of a further continuance was harmless error." Appellee's Br. 17. The State contends that any error was harmless "because White *could* have been convicted without the information presented in the recording," and "[t]he State presented a substantial amount of evidence that

---

[9] The State does not explain how the failure to disclose the recordings was not a discovery violation.

19

adequately supports the guilty verdict." *Id.* at 16 (emphasis added). The State's argument misapplies the harmless-error rule, suggesting that we may affirm simply because other evidence in the record would have been sufficient to support the verdict. However, "[a]n error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty." *Young v. State*, 981 So. 2d 308, 313 (¶17) (Miss. Ct. App. 2007) (quoting *Forrest v. State*, 335 So. 2d 900, 903 (Miss. 1976)).

¶39.   In this case, the district attorney stated that if the judge was inclined to grant White a continuance, the State would withdraw the untimely disclosed evidence.[10] Therefore, it is logical to assess the prejudice that resulted from the admission of the evidence, rather than only from the denial of a continuance or a mistrial. Applying the proper harmless-error standard, *see Young*, 981 So. 2d at 313 (¶17), it cannot be said with assurance that the admission of the evidence was harmless.

¶40.   Moreover, our Supreme Court has indicated that the harmless-error rule plays a limited role in the case of such a clear and significant violation of the discovery rules. In *Norris*, the Court reasoned that "[t]he night before a jury trial is a very busy time for even a well-prepared lawyer under the best of circumstances." *Norris*, 735 So. 2d at 365 (¶6). Recognizing this, the Court held that,

> [u]nder *Box* and its progeny, the defendant is not required to show prejudice, nor is he required to demonstrate what, if any, efforts have been made in order

---

[10] *See* URCCC 9.04(I)(3) ("The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.").

> to rebut the late discovery. Neither our cases nor our rules require defendants to demonstrate prejudice where there has been a gross discovery violation by the State, as presented here.

*Id.* This reasoning applies in the instant case, which involves a similarly "gross discovery violation" and an untimely disclosure on the *day of* trial rather than the "night before."

¶41. Similarly, in *Galloway*, the Supreme Court stated:

> We do not say there can never be a harmless discovery error. We remind one and all of the realities of the phenomena we address. In many discovery cases neither this Court nor the trial court is in a position to decide that a tardy disclosure of witnesses or evidence has or has not resulted in unfair surprise, or prejudice, to the defendant. Certainly this Court has only the cold record to read. *That the record does not affirmatively reflect prejudice does not prove there has been none.* Where there is prejudice, it often will arise from matters not of record, that by their very nature *cannot* be in the record. The line of questioning defense counsel failed to pursue because he did not have time to prepare will not appear. The rebuttal witness who could have impeached the prosecution's surprise witness, but who was not found because the defense had no time to get out and search for him, will not be in the record. There are numerous other examples the experienced trial lawyer will readily call to mind. Our harmless error rule may not with justice be enforced on the assumption of a world that does not exist.

*Galloway*, 604 So. 2d at 740 (emphasis in original).

¶42. The Court's reasoning in *Norris* and *Galloway* fits this case. When defense counsel showed up for trial on Tuesday, May 5, 2015, a jury had already been picked, and he was prepared to give his opening statement based on the evidence that the State had disclosed in discovery. Without warning, the district attorney announced to the court that he intended to offer into evidence recorded phone conversations involving White, which he described as a "confession." While the district attorney's description of the recordings may have been

overstated, there is no doubt that this newly disclosed evidence—which had been in the State's possession for two years—was critically important. Following the district attorney's surprise announcement, the trial was recessed just long enough for defense counsel to listen to the ninety-five-plus minutes of garbled phone calls. The recordings are not easy to understand or follow, and the State waited another two days before identifying the segments that it intended to use at trial. The prosecution then made extensive use of the evidence at trial, including to rebut one of the defense's primary attacks on the State's case.

¶43.   It is impossible to know or reconstruct what defense counsel might have done had he been given a reasonable opportunity to prepare to meet this evidence. White was entitled to that opportunity under Rule 9.04, and "where there has been [such] a gross discovery violation by the State, as presented here," our Supreme Court has stated that the defendant is not required "to demonstrate prejudice." *Norris*, 735 So. 2d at 365 (¶6). Accordingly, we reverse and remand for a new trial.

## II.    *Speedy Trial*

¶44.   Although we reverse and remand for a new trial for the reasons discussed above, we also address White's speedy-trial claim because violation of the defendant's right to a speedy trial requires that the charges against him be dismissed with prejudice. *See, e.g.*, *Smith v. State*, 550 So. 2d 406, 409 (Miss. 1989). White alleges a violation of his statutory right to a speedy trial only, not his constitutional right. Mississippi Code Annotated section 99-17-1 (Rev. 2015) provides: "Unless good cause be shown, and a continuance duly granted by the

22

court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." Nearly 600 days passed between White's arraignment and trial; however, White concedes that nearly 400 days passed before he ever asserted his right to a speedy trial, at which point he filed a motion to dismiss on that ground.

¶45. This Court recently reaffirmed that a defendant waives his statutory right to a speedy trial if he fails to assert the right at any time prior to the end of the 270-day statutory period:

> [T]his Court has repeatedly "held that if a defendant fails to raise the statutory right to a speedy trial within 270 days of his arraignment, he acquiesces to the delay." *Whitaker v. State*, 114 So. 3d 725, 730 (¶18) (Miss. Ct. App. 2012) (quoting *Roach v. State*, 938 So. 2d 863, 867 (¶9) (Miss. Ct. App. 2006)); *accord, e.g.*, *Mims v. State*, 856 So. 2d 518, 522 (¶11) (Miss. Ct. App. 2003); *Malone v. State*, 829 So. 2d 1253, 1257 (¶11) (Miss. Ct. App. 2002) (citing *Walton v. State*, 678 So. 2d 645, 649-50 (Miss. 1996)). The Supreme Court has also held that "a defendant may effectively waive his right to complain of not being tried within the 270-day period set out in [section] 99-17-1, when the defendant does not request or assert his right to a speedy trial or object to a delay, especially when the defendant fails to show any prejudice in the failure to be tried within the statutory 270-day period." *Guice v. State*, 952 So. 2d 129, 142 (¶28) (Miss. 2007) (citing *Walton*, 678 So. 2d at 650).

*Collins v. State*, No. 2016-KA-00422-COA, 2017 WL 2263764, at *3 (¶16) (Miss. Ct. App. May 23, 2017). White failed to assert his statutory right to a speedy trial until well after the statutory period had run. Therefore, his statutory claim is waived and without merit.[11]

### III. Sufficiency of the Evidence

---

[11] A defendant's failure to assert his constitutional right to a speedy trial does not operate as a waiver of the right but is one of the factors to be weighed in determining whether the right has been violated. *Barker v. Wingo*, 407 U.S. 514, 528-29, 531-32 (1972). As noted above, White does not allege a violation of the constitutional right.

¶46. White also argues that there is insufficient evidence to sustain his convictions on Counts I, II, V, and VI. White primarily argues that Penman and Thomas were not credible witnesses because, in their initial reports to police, they described a perpetrator who was taller and heavier than White. We address White's argument because a determination that the evidence was insufficient would mandate a judgment of acquittal on these counts, and retrial on the charges would be barred by the Double Jeopardy Clause of the United States Constitution. *See generally Burks v. United States*, 437 U.S. 1 (1978).

¶47. When the defendant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). The issue on appeal is not whether *we* would have found White guilty on the relevant counts based on the evidence presented at trial; rather, his conviction must be affirmed if there was enough evidence for "any rational trier of fact" to have rendered a guilty verdict. *Id.*

¶48. "The jury sits as trier of fact and is charged with the duty of determining what weight and worth to afford the testimony of the various witnesses." *Woods v. State*, 883 So. 2d 583, 589 (¶16) (Miss. Ct. App. 2004). "It is the obligation of defense counsel to test the credibility of adverse witnesses," including by "pointing out prior inconsistencies in reports of the same incident made by the witness." *Id.* "However, even an unequivocal showing that

24

a witness has related a version of events at some earlier time substantially at variance with that offered at trial does not necessarily destroy the evidentiary value of the witness's in-court testimony." *Id.* "It is simply a matter for the jury to consider when it evaluates the probative value of the witness's version of events related at trial." *Id.*

¶49. The evidence presented at trial in this case, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find, beyond a reasonable doubt, that White was guilty on the charges of robbing and carjacking Penman and Thomas. Both Penman and Thomas positively identified White as the perpetrator in non-suggestive, six-person photo lineups. Also, both reaffirmed their identifications at trial. The issues that White raises on appeal go to the weight of their testimony, not its legal sufficiency. These are issues for a jury to determine at trial and are not a basis for entry of a judgment of acquittal. Accordingly, this issue is without merit.

## CONCLUSION

¶50. For the foregoing reasons, we reverse White's convictions on Counts I, II, V, VI, and IX and remand the case for a new trial.

¶51. **REVERSED AND REMANDED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, FAIR AND WESTBROOKS, JJ., CONCUR. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., AND GREENLEE, J.**

**CARLTON, J., DISSENTING:**

¶52. Because I would affirm White's convictions and sentences, I respectfully dissent from

25

the majority's opinion.

¶53. Pursuant to a nine-count indictment, a Hinds County grand jury indicted White for four counts of armed robbery, four counts of armed carjacking, and one count of possession of stolen property. *See* Miss. Code Ann. § 97-3-79 (Rev. 2006); Miss. Code Ann. § 97-3-117 (Rev. 2006); Miss. Code Ann. § 97-17-70 (Supp. 2012). A jury subsequently found White guilty of two counts of armed robbery, two counts of armed carjacking, and one count of possession of stolen property. On appeal from his convictions, White raises the following issues: (1) whether the circuit court erred by refusing his request for a continuance on the first day of trial; (2) whether the circuit court erred by admitting lay-witness testimony about the alleged location of a victim's cell phone; (3) whether the circuit court erred by admitting testimony that violated his right to confrontation; (4) whether the circuit court erred by failing to sua sponte sever the counts against him; (5) whether the circuit court erred by denying his motion to admit evidence of an audio-taped conversation; (6) whether the circuit court illegally sentenced him to serve ten years for possession of stolen property; (7) whether his statutory right to a speedy trial was violated; and (8) whether insufficient evidence existed to support the verdicts for Counts I, II, V, and VI, or alternatively, whether the verdicts for Counts I, II, V, and VI were against the overwhelming weight of the evidence.

**FACTS**

¶54. On August 21, 2013, the grand jury returned a nine-count indictment against White. Counts I and II charged White with the armed robbery and armed carjacking of Penman on

26

April 7, 2013. Counts III and IV charged White with the armed robbery and armed carjacking of Davis on April 22, 2013. Counts V and VI charged White with the armed robbery and armed carjacking of Thomas on April 22, 2013. Counts VII and VIII charged White with the armed robbery and armed carjacking of Taylor on April 23, 2013. Count IX charged White with the possession of Bailey's stolen vehicle on April 24, 2013.

### a. White's Motions to Dismiss for Lack of a Speedy Trial

¶55. Pursuant to Mississippi Code Annotated section 99-17-1 (Rev. 2015), White filed a pretrial motion on October 22, 2014, seeking to dismiss the charges against him for failure to provide a trial within 270 days of his arraignment. After a hearing on the matter, the circuit court entered a November 14, 2014 order denying White's motion.

¶56. At the final pretrial-motions hearing, White's attorney renewed the motion to dismiss for lack of a speedy trial. As during the first hearing on the issue, both parties agreed that more than 270 days had passed since White's arraignment. However, the State asserted the delay was due in no part to the State's actions but simply due to an overcrowded case docket. After considering the parties' arguments, the circuit court once more denied White's motion to dismiss.

### b. Penman's Armed Robbery and Armed Carjacking

¶57. At White's trial, the jury first heard testimony about the armed robbery and armed carjacking involving Penman. On April 7, 2013, Officer Anthony Johnson responded to a call about the armed robbery and armed carjacking. Officer Johnson arrived at the crime

27

scene, where he met with and interviewed Penman. Penman told Officer Johnson that around 8 p.m. that evening an African American man wearing a white t-shirt and a blue ball cap had stolen his wallet, phone, and 2007 Toyota Corolla at gunpoint.

¶58. At White's trial, Penman testified that he had just returned to his house in Jackson, Mississippi, after visiting his parents. Penman stated that he drove by a man walking down the street but did not think much of it. After pulling into his driveway, Penman turned his car off and began to send a text message to his girlfriend. As he was typing on his phone, Penman noticed some movement out of the corner of his eye. Glancing up at his rearview mirror, Penman saw a man approaching his driver's side door. Penman stated that the man opened the car door and held a silver gun to his side. Penman testified that it was not yet too dark outside and that he got a clear look at the man's face. The man demanded Penman's phone, wallet, and car keys. The man forced Penman to exit the vehicle, and then the assailant drove away in Penman's car. After the man drove away, Penman phoned the police from a neighbor's house.

¶59. Detective Kenneth West testified that White's name surfaced as a possible suspect during the initial investigation of the crime. When police showed Penman a photo lineup of six possible suspects the day after the crime, Penman positively identified White as the man who robbed and carjacked him at gunpoint. Penman also testified at trial that he downloaded an application (app) after the crime to notify him of his stolen phone's location. Penman stated that he received an email the day after the crime that notified him the app had located

28

his missing phone. The app gave Penman coordinates for his phone's location. Penman testified that he used Google maps to look up the coordinates. He further testified that the online search indicated his phone was around 932 or 933 Carnation Street.[12] Penman immediately forwarded the information to Detective West.

### c. Davis's Armed Robbery and Armed Carjacking[13]

¶60. Detective West testified that, around 10:30 p.m. on April 22, 2013, police received another report about an armed robbery and armed carjacking. The victim, Davis, told police that she had just returned to her apartment complex after finishing work. As she pulled into her parking spot, Davis noticed an African American man walking in her direction. Davis parked her car, a white 2005 Jeep Cherokee, and began to walk to her apartment. Davis testified that someone snatched her car keys from her hand. When she turned around, she saw the same man she had observed earlier. Davis testified that the man pointed a gun in her face, stole her purse, which contained her phone, and then drove away in her vehicle. Davis stated that she ran inside her apartment and called the police.

¶61. Officer Willie Myers testified that he was on patrol around midnight on April 22, 2013, when he and another officer, Jeremy Nelson, spotted a vehicle matching the description of Davis's stolen Jeep Cherokee. Officer Myers testified that the vehicle was

---

[12] The jury later heard testimony from a detective investigating a separate armed robbery and armed carjacking that White lived at 933 Carnation Street.

[13] The offenses against Davis were charged as Counts III and IV of White's indictment. The circuit court ordered a mistrial as to these two counts after the jury failed to render a verdict.

parked in an apartment complex and that an African American man was standing by the open driver's side door speaking to a woman. As the officers approached, the unknown male fled on foot. While Officer Nelson unsuccessfully pursued the male suspect, Officer Myers detained the female suspect, Yasekia Pruitt, for questioning.

¶62. Upon checking the vehicle's license-plate number, the officers confirmed that it was the same Jeep Cherokee that Davis had reported stolen less than two hours earlier. Officer Myers testified that Pruitt claimed she did not know the male suspect's identity but did know that he used the nickname "Star." Pruitt described the male suspect to Officer Myers as an African American man around 140 pounds and 5'6" in height.

¶63. Davis testified at trial that the man who robbed her was in close proximity to her during the crime and that she got a good look at his face. Detective West stated that Davis described her assailant to police as an African American man wearing a gray hoodie and dark jeans. Detective West further stated that Davis described the gun the assailant used as a black semiautomatic handgun. On May 6, 2013, police showed Davis a photo lineup of six possible suspects. From the lineup, Davis positively identified White as the man who robbed and carjacked her at gunpoint.

### d. Thomas's Armed Robbery and Armed Carjacking

¶64. On the same night that Davis was robbed and carjacked at gunpoint, police received another call around 11:10 p.m. about a second robbery and carjacking. The latest victim, Thomas, reported that she returned to her apartment complex a little after 11 p.m. and parked

her 2013 Honda Civic on the street. As she exited her car, Thomas noticed a man approaching her with a gun already drawn. Thomas testified that she began to scream until the man told her to shut up. The man then took Thomas's car keys and ordered her to throw her purse and another bag back into the car. Although the man told Thomas to lie on the ground, Thomas said that she ran toward the apartment complex and hid. The man drove off in Thomas's car, and she used her phone, which was still in her possession, to call 911.

¶65. Corporal Nathan James responded to the report of the armed robbery and armed carjacking involving Davis. Corporal James testified that Davis described her assailant as an approximately six-foot, 150-pound African American man wearing a white t-shirt and dark pants and holding a black handgun. At trial, Thomas testified that she clearly saw the man's face. Thomas stated that the area was lit by a street light located just across the street from where she parked her car the night of the crime. In addition, Thomas testified that the assailant came within an arm's reach of her when he snatched her purse. On April 25, 2013, a few days after the robbery and carjacking, Thomas identified White from a photo lineup as her assailant.

### e. Taylor's Armed Robbery and Armed Carjacking[14]

¶66. The jury also heard from Taylor, who testified that she was robbed and carjacked at gunpoint around 9 p.m. to 10 p.m. on April 23, 2013. Taylor stated that she drove to the

---

[14] The offenses against Taylor were charged as Counts VII and VIII of White's indictment. The circuit court ordered a mistrial as to these two counts after the jury failed to render a verdict.

house of her friend, Miller, after she finished work. Taylor testified that she and Miller were talking in her car in Miller's driveway when a man with a gun knocked on her driver's side window. As the gunman instructed, Taylor opened her door and got out of the car. She testified that the man then walked around to the passenger's side door, exchanged a few words with Miller, and had Miller exit the car as well. The assailant then walked back to the driver's side door and drove away in Taylor's car. Taylor testified that her wallet was in her car and contained her driver's license, her Social Security card, and some cash. After the assailant drove away, Taylor stated that she used her phone, which was still in her possession, to call the police.

¶67. Taylor also testified that, following the robbery and carjacking, Miller borrowed a cell phone and placed a call. She stated that, about forty-five minutes after Miller made the call, a man named Adams drove down the street and returned her car. Taylor testified, however, that Adams was not the same man who robbed and carjacked her. Officer Loretta Watts, who responded to Taylor's 911 call and was at the scene when Adams returned Taylor's car, testified that Miller said he knew the man who robbed and carjacked Taylor. Officer Watts further testified, however, that Miller never revealed to her the assailant's name. Instead, Officer Watts said that Miller contacted Adams, who ended up returning Taylor's car.

¶68. At trial, Taylor testified that she told the police the assailant was an African American man between 5'6" and six-feet tall, that he weighed no more than 200 pounds, and that he carried a black handgun. Taylor further stated that the assailant wore a black and white

jacket, jeans, a hoodie, and a black and white bandana over his face. Although the bandana initially covered the assailant's face, Taylor stated that she got a good look at him when he returned to the driver's side of the car after speaking to Miller. Not only had the bandana slipped down to the man's neck, but Taylor also testified that Miller's house had a motion-activated floodlight that shone on the assailant's uncovered face as he walked back to the driver's side door.

¶69. Detective Melvin Williams investigated the armed robbery and carjacking involving Taylor. Detective Williams testified that he worked another case in which White and a codefendant, Stamps, were arrested. Through his investigation, Detective Williams learned that White lived at 933 Carnation Street. Detective Williams further stated that Stamps had Taylor's Social Security card in his possession at the time of his arrest. As a result, Detective Williams showed Taylor one photo lineup that included White's picture and a second photo lineup that included Stamps's picture. Detective Williams showed Taylor the lineups the day after she was robbed and carjacked. Upon seeing the photos, Taylor positively identified White as the gunman. Detective Williams further testified that, on a separate occasion, he showed the same photo lineups to Miller, who also identified White as the man who robbed and carjacked Taylor at gunpoint.

f. **Bailey's Stolen Vehicle**

¶70. Bailey testified that she was robbed and carjacked at gunpoint sometime between midnight and 1 a.m. on April 22, 2013. Bailey testified that she had driven to an apartment

33

complex to drop off her friend, Younger, and Younger's three-year-old son. While helping Younger unload her belongings from the vehicle, Bailey noticed two young African American men walk by the car. Bailey testified that the two men doubled back toward the car and that each man now held a gun. Bailey stated that one man pointed a black gun at her while the other man pointed a gun at Younger. As instructed, Bailey and Younger gave the men their purses, and Bailey handed the men the car keys to her black 2009 Hyundai Sonata. Although the men initially planned to drive off with Younger's three-year-old son in the backseat, Bailey testified that they changed their minds and allowed Younger to grab her son.

¶71. Although Younger later positively identified one of the assailants, Bailey stated that she was unable to do so due to the hoodies the men wore. Bailey did testify, however, that one of the men had dreadlocks. Bailey further testified that the police contacted her two days after the incident on April 24, 2013, to report that they had recovered her car and that her car keys had been found in White's possession.

¶72. According to the testimony of Officer Adelbert Moore, he received a dispatch call on April 24, 2013, about the possible location of Bailey's stolen vehicle. Officer Moore testified that several units arrived at the location and then followed the vehicle as it drove away. The driver of the vehicle increased his speed, and the officers pursued the vehicle until it stopped near an apartment building. Officer Moore stated that two men exited the vehicle and fled on foot. Officer Moore testified that the driver of the vehicle was around 5'2" to 5'3" and that the passenger was around 5'10" to 5'11". Officer Moore further

34

testified that he recognized the driver of the car as White. Officer Moore and the other officers pursued White and his passenger on foot and apprehended the men a short time later. After apprehending the two men, the officers identified the passenger of the vehicle as Stamps. While conducting a safety search, Officer Moore found a Social Security card belonging to Taylor in Stamps's possession. In White's possession, Officer Moore found a set of car keys that White claimed belonged to his girlfriend. Officer Moore testified, however, that the keys unlocked Bailey's stolen car, which the officer had just seen White driving.

### g. Audio Recordings

¶73. On May 5, 2015, prior to opening statements on the first day of White's trial, and outside the jury's presence, the State informed the circuit court and the defense that it had just received several audio recordings from Detective West, who investigated the armed robberies and armed carjackings of Penman, Davis, and Thomas. As the record reflects, Detective West was scheduled to be one of the State's first witnesses on the first day of trial. The State explained that the tapes recorded seven conversations between White and his girlfriend while White was incarcerated in the Simpson County Jail. Subject to the defense's review of the audio tapes, the State moved to admit the tapes into evidence.

¶74. The circuit court granted a recess to give the defense an opportunity to review the audio tapes. *See* URCCC 9.04. After reviewing the tapes, the defense argued that the State had committed a blatant discovery violation and that the circuit court should preclude the use

35

of the tapes. In the event that the circuit court decided to admit the tapes, the defense asked for a mistrial. Alternatively, the defense asked for a continuance to reevaluate how it should best proceed in light of the State's revelation of the audio tapes. The defense further argued that a majority of the content of the audio tapes was completely irrelevant and inadmissible.

¶75. After considering the parties' arguments, the circuit court denied the defense's request for a mistrial or a continuance and gave the State an opportunity to lay a proper foundation to admit specific portions of the tapes. The State called Detective Williams, who not only obtained the tapes from the Simpson County Sheriff's Department but also helped with the investigations involving Bailey's and Taylor's stolen vehicles. Following the State's proffer of Detective Williams's testimony, the circuit court admitted certain portions of the seven recordings.

¶76. During the trial, Detective Williams testified about the contents of the tapes and how he obtained the tapes. Detective Williams stated that he received a phone call from Captain Williams of the Simpson County Sheriff's Department about recorded conversations involving White. After listening to the recordings over the phone, Detective Williams and Detective West traveled on April 26, 2013, to retrieve the audio tapes. Detective Williams testified that the audio tapes contained a recorded conversation between White and his girlfriend, with Stamps's voice audible in the background of the conversation. In addition to stating that he recognized both White's and Stamps's voices after listening to the recording, Detective Williams testified that White was mentioned by name on the recording.

36

¶77. In accordance with its prior ruling, the circuit court allowed the State to admit into evidence and play for the jury certain portions of the audio-taped conversation. After the jury listened to the recordings, Detective Williams provided further testimony about the substance of the recordings. As Detective Williams testified, the audio tapes recorded White having a conversation with his girlfriend. While speaking with his girlfriend, White successfully guided her to a location where two guns were hidden. One of the guns White's girlfriend retrieved was black, which White identified during the conversation as his gun. After White's girlfriend retrieved his gun, White asked Stamps about the second gun's location. Soon after Stamps's response, White's girlfriend was able to locate the second gun, which White stated belonged to "Islam." White also discussed getting caught by the police after driving a stolen car. Based on what he heard after listening to the recordings, Detective Williams testified that he felt the evidence was pertinent to both his and Detective West's investigations.

### h. Defense's Case-in-Chief

¶78. During its case-in-chief, the defense called Adams as a witness. Adams testified that he received a call from Miller the night of April 23, 2013, following the armed robbery and armed carjacking involving Taylor. As the jury heard during the State's case-in-chief, Miller placed a phone call to Adams after the crime occurred, and Adams subsequently arrived at the scene to return Taylor's stolen car.

¶79. According to Adams, after receiving Miller's call the night of April 23, 2013, he

37

(Adams) met someone named "Vontae" at a gas station to retrieve Taylor's car. Adams testified that he did not really know "Vontae" but had seen him around "the neighborhood." Adams testified that, at their gas-station meeting the night of April 23, 2013, "Vontae" gave Adams the car keys to Taylor's car and told Adams where to find the car. Adams stated that no one else accompanied "Vontae" to the gas station. Adams further stated that, at the time he met "Vontae" at the gas station, he did not know White but had since come to know White as "K.D." After leaving from his gas-station meeting with "Vontae," Adams testified that he retrieved Taylor's car and then drove to Miller's house, where the police ended up arresting him for marijuana possession.

¶80. The defense also called Islam Wilson as a witness. In response to the defense's question as to whether he had committed the armed robberies and armed carjackings involving Penman, Davis, Thomas, and Taylor, Wilson invoked his Fifth Amendment privilege against self-incrimination. On cross-examination by the State, Wilson testified that he knew White as "K.D." and that he knew White's girlfriend. However, he again invoked his Fifth Amendment privilege when questioned about the last time he had spoken to White or White's girlfriend. Wilson also invoked his privilege when asked whether he had spoken to White, White's girlfriend, or any of White's family or friends about the case against White.

### i. White's Convictions, Sentencing, and Appeal

¶81. After considering the evidence and testimony, the jury found White guilty of the

38

following: Counts I and II, the armed robbery and armed carjacking of Penman; Counts V

and VI, the armed robbery and armed carjacking of Thomas; and Count IX, possession of

stolen property. As to the remaining counts charged in the indictment (Counts III and IV,

the armed robbery and armed carjacking of Davis, and Counts VII and VIII, the armed

robbery and armed carjacking of Taylor), the circuit court declared a mistrial after the jury

failed to render a verdict. The circuit court then sentenced White to serve separate twenty-

five-year sentences for each armed-robbery conviction and for each armed-carjacking

conviction and to serve a ten-year sentence for the conviction of possession of stolen

property. The circuit court ordered all five sentences to run concurrently with one another

and to be served in the custody of the Mississippi Department of Corrections (MDOC).

¶82.    White filed an unsuccessful motion for a judgment notwithstanding the verdict or, in

the alternative, a new trial. Aggrieved by his convictions and sentences, White appeals.

**DISCUSSION**

I.      **Whether the circuit court erred by refusing White's request for a
        continuance on the first day of trial.**

¶83.    Prior to opening statements in White's trial, the State informed the circuit court and

the defense that it had just received audio recordings it wished to offer into evidence. White

asserts that the State's disclosure resulted in a discovery violation that unfairly surprised him

and prejudiced his defense. White further argues that the circuit court abused its discretion

by denying his motion for a continuance.

¶84.    This Court reviews a trial court's denial of a motion for a continuance for abuse of

39

discretion. *Flaggs v. State*, 999 So. 2d 393, 399 (¶16) (Miss. Ct. App. 2008). "An abuse of discretion does not constitute reversible error unless a substantial right of a party has been adversely affected." *Id.* at 405 (¶35) (citation omitted). Where a party alleges that a discovery violation has occurred at trial, the trial court must follow the procedure established by Rule 9.04:

> If[,] during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> 1. Grant the defense a reasonable opportunity to . . . examine the newly produced documents, photographs or other evidence; and
>
> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the nondisclosed evidence or grant a mistrial.

URCCC 9.04.

¶85. On appeal, White does not appear to argue that the circuit court failed to follow Rule 9.04. Instead, as previously stated, he argues that the circuit court incorrectly exercised its discretion when the court denied his motion for a continuance. According to White, the State's disclosure on the first day of trial amounted to a discovery violation that "entitled [him] to a mistrial or a continuance to reevaluate [his] case and [to] prepare to meet the newly disclosed evidence." The defense argued before the circuit court that a continuance

40

was necessary to reevaluate how it should proceed in light of the State's revelation of the newly disclosed audio tapes. In addition to arguing that the State committed a blatant discovery violation, the defense asserted that a majority of the tapes' contents was irrelevant and inadmissible.

¶86. Unlike the majority, upon review, I find the circuit court followed Rule 9.04 when it exercised its discretion and refused to grant the defense a continuance based on the alleged discovery violation. As the record reflects, following the State's disclosure of the audio tapes, the circuit court granted the defense a recess to review the newly disclosed evidence. After reviewing the tapes, the defense asserted that the State had committed a discovery violation, and the defense objected to the admission of the tapes. In the event that the circuit court determined the tapes to be admissible, the defense requested a mistrial or a continuance. However, the circuit court denied the defense's motion and allowed the State an opportunity to lay a proper foundation for the admission of the tapes. After finding that the State properly laid a foundation, the circuit court ruled that certain portions of the audio tapes were admissible. As the record reflects, the defense never asserted that new witnesses or evidence were needed as a result of the audio tape. Because I find no abuse of discretion in the circuit court's denial of the defense's request for a continuance, I find this assignment of error lacks merit. Accordingly, I will address the merits of White's remaining assignments of error.

II.     **Whether the circuit court erred by admitting lay-witness testimony about the alleged location of a victim's cell phone.**

41

¶87. White next argues that the circuit court erred by allowing Penman and Detectives West and Williams to testify about the app Penman used to determine the possible location of his stolen phone. White asserts that the circuit court improperly allowed the State's lay witnesses to provide expert testimony "purporting to pinpoint the location of Penman's stolen cell phone to White's address." White further contends that this improper testimony prejudiced him "because [the testimony] connected him with Penman's stolen cell phone, making it more likely in the jurors'[] eyes that Penman's photo identification was correct and that White was the man who robbed Penman."

¶88. This Court reviews the circuit court's admission or exclusion of evidence for abuse of discretion. *Collins v. State*, 172 So. 3d 724, 738-39 (¶14) (Miss. 2015). With regard to the differences between lay testimony and expert testimony, the Mississippi Supreme Court has explained:

> Mississippi Rule of Evidence 701 provides that lay witnesses may give opinion testimony so long as that testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." M.R.E. 701. Rather, any opinion testimony by a lay witness must be "rationally based on the perception of the witness." *Id.* Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise[.]" M.R.E. 702.

*Id.* at 739 (¶15). "[W]here, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a [Rule] 702 opinion and not a 701 opinion." *Id.* at (¶16) (quoting *Langston v. Kidder*, 670 So. 2d 1, 3-4

42

(Miss. 1995)).

¶89.   In *Collins*, the supreme court addressed an issue of first impression:  whether cell-phone location technology constitutes expert or lay testimony under Mississippi caselaw.  *Id.* at 739 (¶14).  The *Collins* court held:

> [T]estimony that simply describes the information in a cell[-]phone record is properly lay testimony.  Likewise, testimony that merely informs the jury as to the location of cell[-]phone towers may properly be lay testimony when it is based upon the personal observations of the witness.  But testimony that goes beyond the simple descriptions of cell[-]phone basics, specifically testimony that purports to pinpoint the general area in which the cell[-]phone user was located based on historical cellular data, requires scientific, technical, or other specialized knowledge that requires expert testimony.

*Id.* at 743 (¶28).

¶90.   Upon review of the record and relevant caselaw, I find the disputed trial testimony constituted proper lay-witness testimony.  Over the defense's objection, Penman simply testified that he downloaded an app to notify him of his stolen phone's location.  Penman then testified that he received an email from the app the day after the crime and that the email provided coordinates for his phone's purported location.  Penman stated that he typed the coordinates into Google maps and discovered they were for a house around 932 or 933 Carnation Street.  After discovering this information, Penman immediately forwarded the information to Detective West.  Thus, rather than testifying about information based on "scientific, technical, or other specialized knowledge[,]" the record reflects that Penman's testimony remained limited to that information which "the average, randomly selected adult" would possess.  *See Collins*, 172 So. 3d at 739 (¶¶15-16).

43

¶91.   During Detective West's direct examination, the State asked how law enforcement attempted to locate Penman's stolen vehicle. Detective West responded that they used "[a] phone that was taken." Detective West subsequently explained that Penman had used an app to locate his phone and had then provided the information from the app to law enforcement. After receiving Penman's information, law enforcement sent an officer to the location. As with Penman's testimony, the record reflects that Detective West's testimony also remained limited to information that "the average, randomly selected adult" would possess and that would not require any specialized knowledge or expertise. *See id.*

¶92.   Finally, at a later point during its case-in-chief, the State asked Detective Williams whether he was familiar with the address of 933 Carnation Street—the same address about which Penman had earlier testified. After Detective Williams responded that he was familiar with the address, the State asked him to explain how he knew the address. Detective Williams then answered, "I'm familiar with [the address] due to the fact me and Detective West [are] assigned to the same unit. We were working . . . together, and I can recall that he was telling me that one of his complainant's cell phones was recovered at 933 Carnation Street." The defense objected to Detective West's statement as hearsay, but the circuit court overruled the objection. Detective Williams then further testified that White had also provided the address as his residence upon his arrest. Thus, as the record reflects, Detective Williams possessed personal knowledge of White's address since White provided the address upon arrest. *See* M.R.E. 602 ("A witness may testify to a matter only if evidence is

44

introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

¶93. Upon review, I find the record fails to reflect that the disputed testimony from Penman and Detectives West and Williams constituted improper expert testimony. I therefore find no abuse of discretion from the circuit court's admission of the testimony. Accordingly, I find this assignment of error lacks merit.

### III. Whether the circuit court erred by admitting testimony that violated White's right to confrontation.

¶94. White next argues the circuit court erred by admitting Detective Williams's testimony that Miller, a nontestifying witness, had identified White as the person who robbed and carjacked one of the victims. White asserts that Miller's statement to Detective Williams constituted testimonial hearsay. White further contends that the circuit court violated his right to confrontation by admitting Detective Williams's testimony about Miller's statement.

¶95. "This Court reviews a Confrontation Clause objection de novo." *Polk v. State*, 205 So. 3d 1157, 1160 (¶8) (Miss. Ct. App. 2016) (citing *Beecham v. State*, 108 So. 3d 402, 404 (¶5) (Miss. Ct. App. 2011)). As this Court has previously explained:

> The Confrontation Clause guarantees a criminal defendant the right to be confronted with the witnesses against him. In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that testimonial evidence could not be admitted against a criminal defendant unless the declarant was unavailable at trial, and the defendant had a prior opportunity to cross-examine him.

45

The *Crawford* Court indicated that a statement is likely to be determined testimonial if it was made with an eye toward using the statement at trial.

In *Michigan v. Bryant*, 562 U.S. 344 (2011), the Supreme Court clarified the distinction between testimonial and nontestimonial statements. The Supreme Court articulated the following rule: When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the primary purpose of the interrogation by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. If the court determines that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency, then the statements are nontestimonial and may be admitted pursuant to the rules of evidence. But if the primary purpose was to establish or prove past events potentially relevant to later criminal prosecution, then the statements are testimonial.

*Bufford v. State*, 191 So. 3d 755, 759 (¶¶13-15) (Miss. Ct. App. 2015) (internal citations and quotation marks omitted).

¶96. In the present case, the jury heard testimony from Taylor, one of the victims, that she and Miller were sitting inside her car when someone robbed and carjacked her at gunpoint. Detective Williams investigated the crime. On separate occasions, Detective Williams showed Taylor and Miller photo lineups. Detective Williams stated that both Taylor and Miller identified White from the photo lineups. Taylor herself testified to this fact, but Miller never testified at White's trial. The record reflects, however, that the defense neither raised an objection nor moved to strike Detective Williams's testimony that Miller identified White from a photo lineup. In fact, on cross-examination, the defense further questioned Detective Williams about the photo lineup and Miller's identification of White. Thus, this issue is barred from review on appeal absent plain error. *See Willie v. State*, 204 So. 3d 1268, 1278

46

(¶28) (Miss. 2016).

¶97. In *Willie*, the supreme court explained:

> We apply the plain-error rule only if a defendant's substantive or fundamental rights are affected. Applying the plain-error rule, the Court must determine: (1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. Only if the error resulted in a manifest miscarriage of justice will reversal occur.

*Willie*, 204 So. 3d at 1279 (¶29) (internal citations and quotation marks omitted).

¶98. Upon review, I find that, even if the circuit court erred by allowing Detective Williams's testimony about Miller's photo identification of White, White fails to show how the error prejudiced him. The jury heard testimony that Taylor also positively identified White from a photo lineup. Furthermore, Taylor herself testified at White's trial and identified White in open court as the man who robbed and carjacked her at gunpoint. Despite this testimony, however, the jury failed to reach a verdict on the two counts pertaining to Taylor's armed robbery and carjacking. As a result, the circuit court declared a mistrial on these two counts. I therefore find that no manifest miscarriage of justice resulted from the admission of Detective Williams's testimony about Miller's photo identification of White. Accordingly, I find this argument lacks merit.

### IV. Whether the circuit court erred by failing to sua sponte sever the counts against White.

¶99. In his next assignment of error, White claims the circuit court erred by failing to sua sponte sever the nine counts charged in his indictment. This Court reviews a circuit court's

47

decision to grant or deny a severance for abuse of discretion. *See* URCCC 9.03.

¶100. Pursuant to Mississippi Code Annotated section 99-7-2(1) (Rev. 2015), the same indictment may charge a defendant with separate counts for multiple offenses if "(a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." However, upon a motion by either the State or the defense, a circuit court possesses the discretion to sever the offenses:

1.  If before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or

2.  If during trial, upon the consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.

URCCC 9.03. In determining whether severance is proper, the circuit court should consider the following factors: "(1) whether the time period between the [offenses] is insignificant; (2) whether the evidence proving each count would be admissible to prove each of the other counts; and (3) whether the crimes are interwoven." *Lomax v. State*, 192 So. 3d 975, 981 (¶31) (Miss. 2016) (citing *Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991)).

¶101. Prior to White's trial, his attorney filed a motion in limine to sever the nine counts charged in his indictment. However, during the final pretrial-motions hearing, White's attorney withdrew the motion to sever after White advised him that he did not wish to proceed on the motion. On appeal, though, White asserts that the circuit court committed plain error by failing to sua sponte sever the counts charged in his indictment.

¶102. As previously discussed, this Court only applies the plain-error rule when a defendant's substantive or fundamental rights have been affected. *Willie*, 204 So. 3d at 1279 (¶29). After considering both the record and relevant caselaw, I find no such error here that affects either White's substantive or fundamental rights. As a result, I find no merit to White's argument that the circuit court erred by failing to sua sponte sever the counts charged in his indictment.

### V. Whether the circuit court erred by denying White's motion to admit evidence of an audio-taped conversation.

¶103. White next alleges that the circuit court erred by denying his motion in limine to admit a recorded telephone conversation he allegedly had with Wilson. "The relevancy and admissibility of evidence are largely within the discretion of the trial court . . . . Unless the trial judge's discretion is so abused as to be prejudicial to a party, this Court will not reverse his ruling." *Ratliff v. State*, 752 So. 2d 416, 420 (¶11) (Miss. Ct. App. 1999) (citation omitted).

¶104. At the pretrial-motions hearing, the defense stated that, during White's incarceration, his father helped him secretly record a telephone conversation with Wilson. The defense admitted that portions of the recording were unintelligible. However, the defense asserted that other portions of the recording were intelligible and clearly supported the defense's theory that Wilson committed the crimes charged against White. As a result, White's attorney argued the recording was relevant and should be admitted into evidence if authenticated.

¶105. After listening to the audio recording, the circuit court ruled as follows:

> Upon review of the audiotape, the [c]ourt finds that much of the audiotape is unable to be heard. There are portions of the tape where the [c]ourt can somewhat decipher what is being said[,] but much of it is not clear. If the [c]ourt could hear the whole recording and determine what [the] two individuals [were] talking about[,] then it possibly would be relevant, but the [c]ourt cannot decipher the full context of what they were talking about[.] [T]herefore, the [c]ourt find that [the recording] is not relevant. If it were relevant, then we would have hearsay issues with respect to the recording. There's no one to say specifically who was on the other end of the conversation. We do know that it is purported to be Islam Wilson[,] and that is what the person [who] would authenticate the tape would say[,] but that would be hearsay.

Based on its findings regarding the inability to hear or authenticate the audio recording, the circuit court denied White's motion to admit the recording.

¶106. As a predicate to admission, the proponent of a recording must prove the recording is "relevant as defined by [Mississippi Rule of Evidence] 401, as well as authentic as required by [Mississippi Rule of Evidence] 901." *Ratliff*, 752 So. 2d at 420 (¶13) (citing *Ragin v. State*, 724 So. 2d 901, 903 (¶3) (Miss. 1998)). "The recording passes the relevancy test of Rule 401 if it has a 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting M.R.E. 401). The recording also satisfies the authenticity test of Rule 901 where "evidence is introduced which is 'sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* at 421 (¶15) (citing *Ragin*, 724 So. 2d at 903 (¶6)). I also acknowledge that "[t]he mere fact that portions of . . . a recording are inaudible does not render [the recording] per se inadmissible." *Oatis v. State*, 726 So. 2d

50

1230, 1235 (¶25) (Miss. Ct. App. 1998) (quoting *Middlebrook v. State*, 555 So. 2d 1009, 1012 (Miss. 1990)).

¶107. In the present case, I find White fails to meet his burden to demonstrate the audio recording's relevancy and authenticity, as required by the Mississippi Rules of Evidence. *See* M.R.E. 401, M.R.E. 901. After listening to the audio recording, the circuit court specifically found that White failed to meet the predicate requirements for admission. The circuit court stated that much of the tape was unintelligible and that, as a result, White could not prove the tape's relevancy. Furthermore, the circuit court found that hearsay issues existed with respect to the audio recording and that White failed to produce anyone to authenticate the tape. Thus, based on a review of the record, I find no abuse of discretion from the circuit court's exclusion of the tape. I therefore would refuse to reverse the circuit court's ruling on this issue.

**VI.      Whether the circuit court illegally sentenced White to serve ten years for possession of stolen property.**

¶108. In his next assignment of error, White claims the circuit court illegally sentenced him "to serve ten (10) years for Count IX (possession of stolen property) instead of five (5) years pursuant to Mississippi Code Annotated [s]ection 97-17-70(4) (Rev. 2014)." This Court reviews an assertion regarding an illegal sentence for abuse of discretion. *Long v. State*, 52 So. 3d 1188, 1195 (¶26) (Miss. 2011). "[T]he general rule in this state is that a sentence cannot be disturbed on appeal so long as it does not exceed the maximum term allowed by statute." *Id.* (citation omitted).

51

¶109. On August 21, 2013, the grand jury indicted White for possession of stolen property in violation of section 97-17-70. The indictment charged that the value of the stolen property was "in excess of [$500.]" At the time of White's indictment, the applicable version of section 97-17-70(3) provided that any person "who shall be convicted of receiving **stolen property which exceeds Five Hundred Dollars ($500.00) in value** shall be committed to the custody of the State Department of Corrections **for a term not exceeding ten (10) years** or by a fine not more than Ten Thousand Dollars ($10,000.00) or both." Miss. Code Ann. § 97-17-70(3) (Rev. 2006) (emphasis added).

¶110. White's trial began on May 4, 2015. Between the dates of his indictment and his trial, the Legislature amended section 97-17-70 as follows:

> Effective July 1, 2014, [s]ection 97-17-70 changed to provide that the value of the stolen property be "**One Thousand Dollars ($1,000.00) or more, but less than Five Thousand Dollars ($5,000.00)**." Miss. Code Ann. § 97-17-70(4) (Rev. 2014). The penalty for that offense was changed to "imprisonment in the custody of the State Department of Corrections **for a term not exceeding five (5) years** or by a fine of not more than Ten Thousand Dollars ($10,000.00) or both." *Id.*

*Wilson v. State*, 194 So. 3d 855, 867 (¶40) (Miss. 2016) (emphasis added).

¶111. To comply with the statutory amendment to section 97-17-70, the State moved during White's trial to amend the value of the stolen property charged in Count IX of his indictment. Thus, instead of stating that the value of the property exceeded $500, the amended indictment charged that the property's value was between $1,000 and $5,000. The defense raised no objection to the State's motion, and the circuit court accordingly granted the amendment to

52

White's indictment. The circuit court also granted a jury instruction that reflected the valuation change made to Count IX of the indictment.

¶112. Following the trial, the jury found White guilty of Count IX. During sentencing, the circuit court sentenced White pursuant to the version of section 97-17-70 applicable at the time of his indictment even though the court had previously allowed the State to amend the value of the stolen property to comply with the newer, more lenient version of the statute. Pursuant to the version of section 97-17-70 applicable at the time of White's indictment, the circuit court sentenced White to serve ten years in MDOC's custody. *See* Miss. Code Ann. § 97-17-70(3) (Rev. 2006). On appeal, however, White argues the circuit court erred by not sentencing him under the newer, more lenient version of section 97-17-70 that became effective in July 2014.

¶113. Mississippi Code Annotated section 99-19-1 (Rev. 2015) provides:

> No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, unless otherwise specially provided in such statutes.

¶114. In *Wilson*, the supreme court addressed the same issue that White now raises before this Court. *Wilson*, 194 So. 3d at 867 (¶41). In discussing whether the trial court in *Wilson* erred by sentencing the defendant under the older version of section 97-17-70 rather than the

53

subsequent, more lenient version, the supreme court emphasized:

> The . . . statutory language of [section 99-19-1] provides that no new statutory enactment **shall** defeat the prosecution of a crime committed before the enactment of the new statute. Moreover, . . . [s]ection 99-19-1 continues by mandating—again by using the word "shall"—that all laws prescribing punishment for a crime remain in effect for the purpose of ascribing punishment "unless otherwise specially provided" in a newly enacted statute.

*Id.* at 867-68 (¶42) (quoting Miss. Code Ann. § 99-19-1). Concluding that "[s]ection 99-19-1 clearly requires the trial court to sentence an offender under a sentencing statute in place at the time of the crime[,]" the *Wilson* court held that the trial court properly sentenced the defendant under the older version of section 97-17-70 applicable at the time he was indicted. *Id.* at 874 (¶61).

¶115. Upon review, I find the supreme court's recent decision in *Wilson* controls as to which version of the sentencing statute properly applied in the present case. As *Wilson* clearly establishes, White's sentencing fell under the domain of the prior version of section 97-17-70 since that version applied at the time of White's indictment. I therefore find no merit to White's argument that the circuit court illegally sentenced him under the older version of the statute.

### VII. Whether White's statutory right to a speedy trial was violated.

¶116. After discussing White's assertion that his statutory right to a speedy trial was violated, the majority concludes that White waived his statutory claim and that his argument lacks merit. Because I agree with the majority on this point, I decline to further address this assignment of error in my dissent.

54

**VIII. Whether insufficient evidence existed to support the verdicts for Counts I, II, V, and VI, or alternatively, whether the verdicts for Counts I, II, V, and VI were against the overwhelming weight of the evidence.**

¶117. In his final assignment of error, White attacks the sufficiency and, alternatively, the weight of the evidence supporting his convictions for each of the following: Count I, the armed robbery of Penman; Count II, the armed carjacking of Penman; Count V, the armed robbery of Thomas; and Count VI, the armed carjacking of Thomas.[15]

¶118. The majority addresses White's argument that insufficient evidence supported his convictions. Like the majority, I find this assertion lacks merit. The majority does not, however, address White's argument regarding the weight of the evidence. As a result, I will briefly discuss that assignment of error.

¶119. "The standard for reversing a jury's verdict as against the overwhelming weight of the evidence is very high." *Collier v. State*, 183 So. 3d 885, 893 (¶34) (Miss. 2016) (citation omitted). This Court views all the evidence in the light most favorable to the State, and we only reverse if "the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that a reasonable jury could not have found beyond a reasonable doubt that the defendant was guilty." *Id.* (citation omitted). "When a reasonable jury could not have found the defendant guilty beyond a reasonable doubt, then the verdict is so contrary to the overwhelming weight of the evidence that allowing it to stand would sanction an

---

[15] As previously discussed, the circuit court ordered a mistrial as to the remaining counts charge in White's indictment after the jury failed to reach a verdict on those counts.

unconscionable injustice." *Id.* (citation and internal quotation marks omitted).

¶120. With regard to the armed robberies and carjackings involving Penman and Thomas, the jury heard testimony that the victims both got a clear look at their assailant. Penman and Thomas both picked White out of a photo lineup, and both victims testified at White's trial that White was the man who robbed and carjacked them. Furthermore, Penman and Thomas both testified that White approached their cars with a gun drawn and demanded their personal belongings before driving away in their vehicles.

¶121. After viewing the evidence in the record in the light most favorable to the State, I find the jury's verdicts were not so contrary to the overwhelming weight of the evidence that allowing them to stand sanctions an unconscionable injustice. *See id.* As a result, I find that this issue also lacks merit.

¶122. For the foregoing reasons, I would affirm White's convictions and sentences. I therefore respectfully dissent from the majority's opinion.

**IRVING, P.J., AND GREENLEE, J., JOIN THIS OPINION.**